**COBB COIN COMPANY, INC., a Florida Corporation, et al., Plaintiffs,**

v.

**The UNIDENTIFIED, WRECKED AND ABANDONED SAILING VESSEL (Believed to have sunk in 1715), her tackle, armament, apparel, and cargo located within 3,000 yards of a point: Beginning at coordinates 27° 43.8′ N. latitude by 80° 22.8′ W. longitude, Defendant.**

No. 79–8266–Civ–JLK.

United States District Court,
S. D. Florida.

Oct. 2, 1981.

David Paul Horan, Key West, Fla., for plaintiffs.

Linwood Anderson, Smathers & Thompson, Harold Ward, Fowler, White, Burnett, Hurley, Banick & Knight, P.A., Miami, Fla., Susan Gamble, Asst. Atty. Gen., Tallahassee, Fla., Alan Weisberg, Miami, Fla., Jones, Foster & Moss, P.A., Vero Beach, Fla., for defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

JAMES LAWRENCE KING, District Judge.

### HISTORICAL INTRODUCTION

In the early eighteenth century, Spain's dominions extended over one third of the known world. The King of Spain annually sent two fleets of ships to the New World to bring back the wealth of the Americas. One fleet picked up the gold, emeralds, and pearls unearthed from Peruvian mines, at the port of New Granada—present day Cartagena, Colombia; the other boarded delicate pottery and china shipped from the Orient, and Mexican silver, cochineal and indigo dyes, at Veracruz, Mexico. Each year the two fleets met in Havana, Cuba to voyage homeward together across the Atlantic. This afforded the treasure laden galleons some measure of protection from the pirates of the Caribbean who were well aware of the sailing dates of the fleet and the richness of the prize that was theirs if they could but capture one of these vessels.

Normally, the combined fleet sailed by May or June in order to clear the Straits of Florida before the treacherous hurricane season set in, but in the summer of 1715, the fleet of General Don Juan Esteban de Ubilla and General Don Antonio de Echeverz was delayed due to trade problems and the late arrival of four ships from Veracruz.

The Governor General of Havana was painfully aware of the Spanish monarch's critical need for the immense treasure of gold, silver and precious jewels secured in the King's treasure chests awaiting shipment. The Royal Treasury was exhausted by the cost of fighting the war of the Spanish Succession and the failure of the fleet to sail the preceding year. So, notwithstanding that it was the heart of the danger season of the high winds, a treasure fleet of twelve ships departed from Havana Harbor on July 24, 1715.

According to historical accounts, it was an occasion for celebration with brightly colored flags whipping briskly in the breeze and the booming of ceremonial cannon fire ringing in the ears of the throngs of excited citizens crowding the docks. Few of those present, and certainly none of the over two thousand men aboard the ships, had any inkling of what lay ahead on their fateful voyage. Before the week was out, over half their number would be dead and all of their mighty ships, save one, would lie entombed in a watery grave forever.

The galleons sailed northward through the Straits of Florida and past the Florida Keys under a clear and cloudless sky. Their

chartered course, and one that they traditionally followed, took them along the east coast of Florida to a point past Cape Canaveral, then following the Gulfstream until it veered eastward to a point north of Bermuda where the fleet would catch the prevailing winds that carried them across the Atlantic to Spain.

By noon on Tuesday, July 30, 1715, a strange calmness had settled in, punctuated by occasional gusts of strong wind that whipped the waves into ever mounting heights of whitecapped water. By mid-afternoon the sky had darkened and the wind was gusting steadily, whipping spray from the breaking waves over the doomed fleet.

In the early morning hours of July 31st, the wind suddenly shifted to the east-northeast, and the hurricane struck with all its fury. The ships, gripped in the incredible force of the crashing waves and mighty winds of nature's most awesome phenomena, were lifted like matchsticks on mountainous crests to be plummeted in the next instant into deep troughs of the ocean. Tons of seawater crashed over the railings of the galleons and, with the shriek of the wind, drowned out the screams of the seamen washed overboard to their death.

Huge anchors were dropped in a desperate attempt to bring the bows of the ships around into the wind and hold them in the deeper waters offshore. As the wind howled and the hurricane increased in intensity, the panic stricken sailors watched the thick anchor lines snap, one by one. Second, and sometimes third, anchors were dropped as the tempestuous sea pounded the ships relentlessly closer and closer to the jagged reefs and shoals. Ultimately, as the oaken hulls of the once proud and mighty Spanish Treasure Fleet were ripped by the cruel coral of the Florida coast, the seawater poured into the smashed ships and they heeled over and sank.

For the wretched survivors, the hurricane had inflicted an incredible measure of death and destruction; one thousand persons perished, eleven galleons sunk, and fourteen million pesos of treasure lost. Only one vessel survived, under the masterful seamanship of its captain, to limp back to Havana with news of the disaster. Destiny brought the ghosts of these Spanish Galleons, that had set sail bravely from Havana Harbor July 24, 1715, to a rendezvous in an Admiralty Court at the United States Courthouse in Key West, Florida, two hundred and sixty-six years later on July 27, 1981.*

## I. PROCEDURAL HISTORY OF CASE

Nearly two hundred sixty four years from the day these ships were lost to the ocean in the terrible hurricane of July 1715, the treasure and the remains of one ship became the subject of a suit in admiralty in this Court. On August 17, 1979, the plaintiff Cobb Coin filed its complaint seeking to be declared owner in possession of the wrecked vessel located "within 3,000 yards of a point [b]eginning at coordinates 27° 43.8′ N. latitude by 80° 22.8′ W. longitude." Alternatively, it sought an award for salvage services performed on the vessel, her tackle, armament, apparel, and cargo. Three days later the plaintiff retrieved a cannon from the wreck site. On August 29, 1979, the State of Florida answered the complaint, and counterclaimed by asking this Court to declare it owner of the vessel and for restitution from the plaintiff for items it had salved. The State contends it owns all such wrecks within its territorial waters under its Archives and History Act,

* This narrative is a condensed version of the story of the 1715 Plate Fleet, taken from various sources introduced in evidence in the hearing on the plaintiff's motion for preliminary injunction:
Burgess, Man: 12,000 Years Under the Sea (1980);
Burgess, They Found Treasure (1977);
Burgess & Clausen, Gold, Galleons & Archeology (1976);
National Geographic Society, Underseas Treasures (1974);
Wagner, *Drowned Galleons Yield Spanish Gold*, National Geographic, January 1965, at 1;
Wagner & Taylor, Pieces of Eight, Recovering the Riches of a Lost Spanish Treasure Fleet (1967);
These sources were entered in evidence as Joint Exhibits 27–30.

chapter 267, Florida Statutes (1979), and thereby has plenary authority to administer their salvage.

The State's agents have backed up Florida's claim by attempting to enforce the criminal sanctions against unauthorized exploration and salvage against the plaintiff's agents. By mid-summer 1981, those agents were so energetically pursuing that prosecution as to prevent the plaintiff from salving as it is entitled to do under the order of this Court. The plaintiff Cobb Coin, and the intervening plaintiff Real Eight Company, Inc., filed an application for temporary restraining order and motion for preliminary and permanent injunction June 25, 1981. On July 7, 1981, this Court issued a temporary restraining order enjoining the State, its agents, employees, and attorneys from interfering with the plaintiff's ongoing salvage operations by carrying out their threatened arrests. Following that order, an eleven-day hearing on the motion for a preliminary injunction ensued, in which the parties presented extensive evidence and oral argument in the premises. Part of the following procedural history is taken from the July 7, 1981, order of this Court.

Cobb Coin Company, Inc., a Florida corporation, filed its complaint in admiralty August 17, 1979, contending that it had title to the abandoned vessel described as the defendant in this Court and believed to be a Spanish Galleon which sank in 1715 at a point a few hundred yards off the Sebastian Inlet, St. Lucie County, Florida. The claim of title was founded upon the discovery by the plaintiff of the abandoned and wrecked vessel which, it was alleged, was in the total and exclusive possession of the plaintiff at the time of filing the complaint in this Court.

Thereafter, on August 29, 1979, the United States District Court entered an arrest *in rem* directing the United States Marshal to take into custody a cannon from the Spanish Treasure Galleon which had been brought up from the ocean floor on August 20, 1979.

Earlier, on August 22, 1979, the plaintiff corporation sought a temporary restraining order against the intervening claimant, State of Florida, alleging that said intervenor was intending to interfere with the jurisdiction of the United States District Court for the Southern District of Florida. Specifically, the State's agents threatened to arrest the president of the plaintiff corporation and the captain of the salvage vessel employed by the plaintiff for alleged grand larceny of the cannon from the wreck site.

At a hearing on the application for preliminary injunction held on August 23, 1979, the Honorable Sidney M. Aronovitz, United States District Judge, held that this Court had jurisdiction of the subject matter of this cause pursuant to 28 U.S.C. § 1333, and that possession of the cannon recovered from the wreck site on August 20, 1979, "constituted constructive possession of the wreck itself and everything that is a part thereof, wherever located, and whenever removed therefore, past, present or future." Judge Aronovitz ordered the United States Marshal for the Southern District of Florida, "to receive and take into his possession and control any and all items that have or will come up from the wreck in question, no matter who has brought up or who will bring up such items until a determination of ownership is made or a further order of this Court is issued."

The intervening claimant, State of Florida, sought an injunction preventing Cobb Coin Company, Inc., from continuing to salvage from the wreck site involved in this suit and moved for an order appointing the State as substitute custodian of the artifacts then being recovered from the wrecked Spanish Galleon. On October 12, 1979, after a full evidentiary hearing thereon, this Court denied the State's application for preliminary injunction and change of custodian in the following language:

Whether the State of Florida has a sovereignty submerged lands claim to the wreck is a matter to be determined later. The artifacts and cannons are presently in the custody of the U.S. Marshal, who has been ordered to consult officials of the State of Florida to the extent neces-

sary to preserve the value of those items. The State has not claimed that the Marshal is incapable of maintaining the cannon, nor that any damage to it has taken place. Rather, the State claims merely that it will have a more difficult time supervising the cannon once its agents leave the area of the wreck. That claim is insufficient to support a change of custodians, especially given the conflicting claims of ownership in this case. The State's need to place an agent on salvage vessels for the purpose of cataloguing the recoveries does not state sufficient grounds for enjoining the operations of the Cobb Coin Co. The State's interest can be protected by simply placing an agent on Cobb Coin Company's vessels. It is therefore

ORDERED and ADJUDGED that the Cobb Coin, Co., Inc., will allow agents of the State of Florida to come on board its salvage vessels solely to catalogue and authenticate articles brought up from the wreck site. The State's motion for an Order for a preliminary injunction is otherwise denied. It is further

ORDERED and ADJUDGED that Intervenor's motion for an Order appointing it Substitute Custodian is denied.

The United States Marshal of this District contracted with a Mr. Arthur Hartman, to be custodian of the salvaged artifacts and to hold and preserve the items of salvage brought up from the defendant wreck site. According to the plaintiff's application for temporary restraining order filed June 25, 1981, hundreds of artifacts were salvaged from the vessel during the salvage season of 1980. Pursuant to this Court's order of October 12, 1979, a State agent was aboard the salvage vessel and observed the recovery of the treasure from the defendant wreck site throughout the salvage season of 1980 and 1981. This State agent catalogued and authenticated the articles brought up from the wreck site in order to insure that the State's interest was fully protected therein. Additionally, Mr. Arthur Hartman, as a representative of the United States Marshal and the custodian, by Court order, of these artifacts made and rendered an accounting of the items salvaged.

On June 15, 1981, Florida Marine Patrol Officers boarded the salvage vessel "Dare" and issued a warning to the captain and crew advising them that they were subject to arrest and prosecution for a violation of the law of Florida against unauthorized exploration and salvage. At the time this warning was issued an agent of the State of Florida was present on the salvage vessel belonging to employees of the plaintiffs, for the purpose of complying with this Court's order permitting the State to have its agents aboard to catalogue and authenticate the items being brought up from the wreck site of the Spanish Galleon.

Thereafter on June 21, 1981, the plaintiff's salvage vessel "Dare" was again boarded by agents of the State of Florida and a criminal citation was issued against the captain of the vessel for a violation of Florida Statute § 267.13.

The plaintiffs contend that the 1981 salvage season has now commenced and that they have made extensive contractual and financial commitments to a full fledged continuation of the salvage operations that were conducted in 1979 and 1980. The plaintiffs assert that an interruption of the on-going salvage operation would result in substantial damages for costs of charter vessels, crews' wages, expenses, up-keep, maintenance, and irreparable damage in loss of control of the site of the wrecked Spanish Galleon by others who would indiscriminately salvage in the absence of any control by the plaintiffs or this Court.

The parties filed motions for a temporary restraining order, preliminary injunction, and rule to show cause why the intervening claimant, State of Florida, should not be held in contempt of Court.

This Court then issued its July 7, 1981, temporary restraining order, based on two major conclusions. First, the propriety of such an order was not precluded by the rule of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Second, the plaintiff's continued salvaging of the wreck

site would be in the best interests of all the parties; the costs of lost investment and opportunity would have been immense, while the artifacts retrieved would be accurately accounted for by both the State's agents and the Federal Court custodian during the period of the Order.

The Court adheres to its ruling of July 7, 1981, that this injunction is not foreclosed by *Younger.* The July 7th Order held:

> [T]he state asserts that the plaintiffs are asking the Court to enjoin its attempts to enforce its criminal laws relying on the principle announced in *Younger v. Harris* . . . and *Mitchum v. Foster* [, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705] . . . . [citations omitted]
>
> . . . .
>
> The Court has determined that the ruling of *Younger v. Harris* . . . does not preclude issuance of the present injunction. The *Younger* doctrine holds that, absent exceptional circumstances, a federal court should not interfere with an ongoing state criminal proceeding. In his order of August 24, 1979, Judge Aronovitz denied Cobb Coin's request for injunctive relief against the state, on the grounds that the existence of none of the exceptional circumstances referred to in *Younger,* such as bad faith harassment on the part of the state officials or irreparable injury, had been demonstrated by Cobb Coin. Judge Aronovitz's ruling, however, was made "without prejudice to the plaintiff or its agents to reapply to this court for relief if circumstances change and warrant same." After careful review, the Court finds that circumstances have changed substantially since Judge Aronovitz's prior order, and that injunctive relief is now warranted.

The plaintiff has asserted that an arrest of any of its employees would work an extreme economic hardship upon Cobb Coin, which has invested thousands of dollars in salvage equipment and manpower. Such an impediment to the ongoing work of Cobb Coin's divers and other skilled personnel, which has been pursued in accordance with this Court's explicit authorization, would clearly cause it irreparable damage. Indeed, were the state to halt Cobb Coin's operations, it is likely that third party salvor-pirates would attempt to reap the hard-won benefits of Cobb Coin's research and labor at the Corrigan's Wreck Site. In the face of such threatened injury, the Court concludes that the principles of *Younger* must give way.

It is further apparent that, by threatening to arrest the salvage vessel's captain and crew, the state is attempting to circumvent the ruling issued by this Court October 12, 1979, which had granted Cobb Coin the right to continue its salvage operations. No appeal was ever taken by the state. Since the Court's ruling, the state has continued to maintain its inspectors aboard the salvage vessels. These inspectors have provided protection of the state's interests by cataloguing and authenticating the various artifacts retrieved. Although Mr. Hartman was delegated custodianship by the U.S. Marshal pursuant to a contract entered into months ago, the state has seen fit to wait until the present time to oppose his appointment and challenge the sufficiency of the safeguards authorized by this Court in October of 1979. Instead of now bringing this matter to the Court's attention and waiting for an appropriate ruling thereon, the state has taken the matter into its own hands. The Court finds that such behavior on the part of the state constitutes no more than bad faith harassment, justifying abrogation of the *Younger* Doctrine.

The Court further concludes that, by threatening to arrest the plaintiff's employees for engaging in salvage operations expressly validated by this Court, the State of Florida is attempting to interfere impermissibly with an ongoing federal matter. Such usurpation of the proper jurisdiction of this Court cannot be tolerated.

■ The efforts by the Florida Marine Patrol to prosecute the plaintiff's employees have intensified since the expiration of the

July 7th temporary restraining order. Considering that the State prosecution began after this Court assumed jurisdiction over the matter, it is clear that Younger does not apply.

As stated in the July 7th Order, this Court was "fully cognizant of the State of Florida's legitimate interest in the preservation of what it considers to be archeological treasures belonging to the State. In order to protect this significant State concern, the Court . . . set the trial in this case for an immediate, final hearing." In so doing, the Court followed the procedure established by the Fifth Circuit Court of Appeals in Treasure Salvors v. Unidentified, Wrecked and Abandoned Sailing Vessel, 640 F.2d 560 (5th Cir. 1981) (Treasure Salvors III). That hearing took place between July 28th and August 11, 1981, and counsel for all parties zealously argued their positions.

The factors calling for the issuance of this injunction are analyzed in Section III of this Order. For purposes of this introduction, it suffices to say that the evidence adduced at the eleven day hearing on the motion for preliminary injunction strongly reinforced the conclusion that an injunction is not only legally justified, but in all the parties', and the public's, best interest.

## II. A THRESHOLD DETERMINATION: THE BASES OF JURISDICTION

A. *Jurisdiction in this Case is Properly Founded on Traditional Maritime, In Rem, and In Personam Principles*

█ As the claimants herein assert that this suit was improperly brought before the Court in the first instance, an analysis of the motion for preliminary injunction must be preceded by a discussion of this Court's admiralty jurisdiction. This action was originally brought in the nature of an *in rem* suit against "The Unidentified, Wrecked and Abandoned Sailing Vessel (Believed to have sunk in 1715), her tackle, armament, apparel and cargo located within 3,000 yards of a point: Beginning at coordinates 27° 43.8′N. latitude by 80° 22.8′W. longitude." Through this suit, Cobb Coin Company, Inc.—a corporation formed by Mr. Mel Fisher and his professional salvaging group specifically for the purpose of conducting salvage operations on this particular wreck site—seeks to assert a salvage claim against the named vessel. Although identified as a "wrecked vessel," [1] it should more accurately be termed a wreck site, for what the teredos and the passage of time have left for salvage is a load of cargo scattered on an expanse of ocean floor. Contrary to what the claimants suggest, however, this Court is not persuaded that the process of natural history which eroded the vessel's structure has similarly diminished the federal rights and remedies now available to a salvor who successfully returns to the mainstream of commerce goods otherwise buried beneath the sea.

At the outset, the Court notes that no parties contest the existence of *in rem* jurisdiction over the artifacts which have actually been brought up from the ocean bottom and turned over to the U.S. Marshal pursuant to these proceedings. The controversy exists with respect to this Court's alleged *in rem* jurisdiction over the named "vessel," [2] and *in personam* jurisdiction over the State.

1. However, for purposes of this suit, since the allegations identifying the vessel were admitted by the State and repeated verbatim by Quest in their respective Claims of Owner, the named "vessel" is here considered to be within the territorial jurisdiction of this Court. *See Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330, 334 (5th Cir. 1978) (*Treasure Salvors I*), quoting *Booth Steamship Co. v. Tug Dalzell* No. 2, 1966 A.M.C. 2615 (S.D.N.Y.1966).

2. Just as did the federal government in *Treasure Salvors I*, the State here seeks a declarato-

ry judgment that "the State of Florida is the sole owner of the Defendant Unnamed Wrecked and Abandoned Sailing Vessel, its equipment and cargo." The reasoning applied by the Fifth Circuit in its opinion is therefore pertinent to this case:

Alternatively we note that assuming a lack of *in rem* jurisdiction of that part of the wreck lying outside the territorial waters of the United States, the district court is not deprived of jurisdiction over the government's counterclaim if that claim rests upon

As discussed above, the true subject of the maritime action in the case before the Court, is not salvageable material ensconced in an extant hull, but the identifiable cargo of the former vessel. The absence of a hull, however, does not affect the traditional maritime right of a salvor to uninterrupted salvage operations where such salvor, in conducting his operations on an identifiable wreck site, does so in a manner demonstrating that degree of dominion and control which is appropriate under the circumstances. *See, e. g., Rickard v. Pringle*, 293 F.Supp. 981 (S.D.N.Y.1968); *Eads v. Brazelton*, 22 Ark. 499 (1861). As stated by the Fifth Circuit in *Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel*, 640 F.2d 560 (5th Cir. 1981) (*Treasure Salvors III*):

> The law ... does not always require that one who discovers lost or abandoned property must actually have it in hand before he is vested with a legally protected interest. The law protects not only the title finally acquired by one who finds lost or abandoned property but also the right of the person who discovers such property,[3] and is actively and ably engaged in reducing it to possession, to complete this project without interference from another. The courts have recognized that in order to acquire a legally cognizable interest in lost or abandoned property, a finder need not always have "manual" possession of the thing. Rather, a finder may be protected by taking such constructive possession of the property as its "nature and situation" permit. *Id.* [Citation to *Eads v. Brazelton*, 22

Ark. at 511]. Thus in *Eads*, the court emphasized that Brazelton [the first finder] need not have actually raised the lead [lead] and put it on board his ship in order to acquire legal protection against interference by others. If Brazelton had merely placed "his boat over the wreck, with the means to raise its valuables, and with persistent efforts directed to raising the lead," *Eads v. Brazelton, supra* at 511, he would have been deemed to have a legally protected possessory interest in the wreck and Eads [the subsequent salvor] would have had no right to interfere with that possession by undertaking his own salvage operations.

640 F.2d at 572.

■ Jurisdiction in such a case is predicated on *in personam*, rather than *in rem* principles. As had been stated earlier by the Fifth Circuit in its *Treasure Salvors III* opinion:

> This type of claim to title by occupancy can, of course, be asserted in an in rem proceeding instituted once the goods have been recovered and brought to shore within the jurisdiction of the court. However, since the law of maritime salvage and finds also protects the right of a salvor who undertakes a project to carry it to completion without interference from others who seek to share in the enterprise and the reward, we think that the admiralty and maritime jurisdiction of the federal courts also encompasses the power to entertain a salvor's claim that another is wrongfully interfering with his ongoing endeavors and to grant such relief as may be appropriate in order to

an independent basis of jurisdiction. [Citations omitted]. In its counterclaim the government requested that "a declaratory judgment be issued affirming the property right of the United States in the *Atocha* .... While no basis of jurisdiction was stated in the counterclaim regarding the extraterritorial portion of the wreck, the record reveals that the government based its claim to rights in the sunken vessel on the Antiquities Act .... [Footnote omitted]. The district court thus had jurisdiction under 28 U.S.C. § 1331 to determine the applicability of these statutes to that portion of the vessel situated in international waters.

*Treasure Salvors I*, 569 F.2d at 335. This analysis is relevant to the present case, in which the State has grounded its right to lay claim to the artifacts found on the wreck site here in question on the operation of the Submerged Lands Act of 1953, 43 U.S.C. §§ 1301–1315 (see discussion in Section III.A.4., *infra*).

3. Subsequent finders acquire the rights of first finders where the prior finder has discontinued effective efforts to save the property or has otherwise abandoned the site. *See* W. Marvin, A Treatise on the Law of Wreck and Salvage 138 (1858) (Footnote supplied).

protect a salvor's right to pursue his salvage endeavor exclusively, even though the property which is the subject of the salvage effort might not be within the territorial jurisdiction of the court.[4] The fact that the property which is the subject of the salvage effort is not within the territorial jurisdiction of the court, and thus not subject to an in rem decree, is irrelevant because the salvor's claim is not one in rem seeking to recover *against* the vessel for salvage in which the in rem fiction is used to personify the vessel and treat it as a party to the litigation. Although rights to the vessel may be the subject of the dispute, the adverse parties in this situation are the competing salvors. Thus, since the court has jurisdiction over them, and the subject matter involves claims based on the maritime law of salvage and of finds, the court is fully competent to adjudicate the dispute regardless of the location of the salvage operations.

640 F.2d 567–68.

While the claimant Quest Corporation has no quarrel with this ground of jurisdiction, the State, after filing its claim of owner and seeking affirmative relief, now makes the eleventh-hour assertion that application of *in personam* jurisdiction principles to it is barred in this case by the Eleventh Amendment. Upon intervening in this litigation, the State, rather than contesting jurisdiction over it, sought to invoke this Court's declaratory powers to its benefit. Now, after having subjected itself to the Court's jurisdiction from the outset by seeking such affirmative relief, the State attempts to assert a shield against any adverse rulings which may result from the litigation by maintaining that it may waive sovereign immunity only by enactment of a general law specifically permitting suit.

In so arguing, however, the State has misplaced its reliance. Both cases cited by the State in support of its proposition are inapposite. The first of these is *Manatee County v. Town of Longboat Key,* 365 So.2d 143 (Fla.1978). In *Manatee County,* three municipalities sued the Board of County Commissioners seeking a remittance of city residents' taxes which had been used to pay for services rendered for the benefit of the unincorporated area only. The cities were proceeding under section 125.01(6)(a) of the Florida Statutes, a section which implements the Florida constitutional provision that property within the municipalities shall not be so taxed. Through it, municipalities are authorized to petition the county governing board, either to set up a compensatory finance scheme for the ensuing year, or to remit to the municipalities the identified cost paid by them under a formula prescribed by law. The Supreme Court of Florida applied the rule that the State's sovereign immunity could only be waived by general law and that such a waiver must be clear and unequivocal, 365 So.2d at 147, but held that the waiver expressed in section 125.01 was clear as to prospective, but not as to retrospective, relief. *Id.*

The court in *Manatee County* cited *Arnold v. Shumpert,* 217 So.2d 116 (Fla.1968), the second case upon which the State here relies. *Arnold* was a suit against the county for negligent maintenance of a traffic signal. The purported basis of governmental liability was a local ordinance providing for insurance coverage and the state statute authorizing counties to provide for insurance coverage. The court held, first, that a general state law, not a local ordinance, was required to waive immunity. Next, it held that the state statute, by enumerating certain items for which counties could purchase insurance, had to be strictly construed and could not be interpreted as waiving immunity for negligent maintenance of traffic signals. 217 So.2d at 120. In other words, where a suit is one which would be barred by sovereign immunity—that is, a suit for past money damages, *see* Section II.B. *infra*—a statute which purportedly waives that immunity will be strictly construed.

4. *See* note 1, *supra.* The remains of the Atocha, to which the *Treasure Salvors III* court was referring, rested outside the State's territorial limit, on the Continental Shelf. *See Treasure Salvors I.* (Footnote supplied).

■ But here, even assuming *arguendo* that the State were, as it asserts, a rightful claimant of such abandoned property as that here in question, the disposition of the artifacts to which the State claims ownership is not an award of money damages against the State to be exacted from her treasury. Therefore, no statutory waiver is necessary, and Florida's arguments are inapplicable.

■ In summary, then, once a salvor who discovers and brings up an artifact from an identifiable wreck site initiates suit by taking that object into federal court, the court acquires jurisdiction not only to adjudicate the disposition of the article already within its territorial jurisdiction, but maritime jurisdiction (based on *in personam* principles) to adjudicate disputes between competing salvors, and *in rem* jurisdiction (coupled with *in personam* jurisdiction over the claimants) to dispose of all articles thereafter brought up from that site. The filing of such a suit is, as here, an open invitation (either at that time, or such time as an applicable interest may thereafter arise) for claimants and competing salvors to come before the court and make their alleged interests known.

B. *This Suit is Not Barred By the Eleventh Amendment*

■ In opposition to the plaintiff's motion, the claimant State of Florida argues that this suit is barred by the Eleventh Amendment to the United States Constitution. Given the Supreme Court's clear exposition of the Eleventh Amendment, this action cannot be construed to be so barred.

■ The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." As the Supreme Court has repeatedly interpreted the amendment, it protects an unconsenting state from suits brought not only by citizens of another state, but by her own citizens. *Edelman v. Jordan*, 415 U.S. 651,

662–63, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974), *citing Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1880). This bar to unconsented-to suits at law or equity applies with equal effect to suits in admiralty. *See In re State of New York*, No. 25, 256 U.S. 490, 503, 41 S.Ct. 588, 591, 65 L.Ed. 1057 (1921).

■ But at this date, it is clear that the immunity afforded by the Eleventh Amendment extends only to suits in which a plaintiff seeks compensatory money damages which would be payable from the state treasury. *Edelman v. Jordan*, 415 U.S. at 663, 667, 94 S.Ct. at 1356, 1362. According to the Supreme Court, "the rule has evolved that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." 415 U.S. at 663, 94 S.Ct. at 1356.

Here, the plaintiff salvor seeks an adjudication of its alleged right to a portion of the property salved. For centuries, the remains of the 1715 fleet to which the plaintiff has directed its efforts lay undisturbed on the ocean bottom. It was not until the period between 1939 and the early 1960's that various treasure hunters became aware of the general location of the wreck sites east of Florida's Sebastian Inlet. In 1967, the Florida Legislature, through the Archives and History Act, first claimed ownership of all sunken historic and archeological artifacts within the State's territorial jurisdiction. The evidence adduced at the hearing on the Motion for Preliminary Injunction indicates that, following that enactment, no active endeavor by the State to recover the sunken treasures and reduce them to possession ensued, except through negotiation of leases pursuant to the provisions discussed above. The plaintiff, in contrast, having retrieved hundreds of artifacts from the deep since filing suit in August, 1979, asks this Court to determine either that it owns those items as finder, or that, by virtue of its services as a successful salvor, it is entitled to an appropriate salvage award.

Under usual circumstances, the application of admiralty principles would lead to an award either of outright ownership of the recovered goods (applying the law of finds) or of entitlement to an appropriate salvage award. The instant case, however, does not present such "usual circumstances." Here, the original "owner" of the artifacts was the King of Spain, who indeed attempted to salvage his wrecked ships, but abandoned the effort in 1716. Now, Florida seeks to claim ownership of the wrecks through legislative pronouncement. As is discussed below, the matrix of state and federal statutes through which Florida stakes its claims does not make the State an "owner" so as to allow it to exercise that dominion which would supercede the plaintiff's federal salvage rights under the maritime law. *See* discussion of the Submerged Lands Act, Section III.A.4., *infra*. Even were the State to be considered the nominal "owner" of the sunken treasures on the ocean bottom, maritime precedent still provides for a salvage award to one who saves property owned by the sovereign by virtue of its expressed sovereign prerogative.[5]

Because of the unusual character of the wreck sites of former vessels in the 1715 Plate Fleet, the form of salvage award to be entered in this case would differ from usual awards. Normally, the salvaged items sued *in rem* are sold to satisfy the judgment, which is stated as a set sum derived from an appropriate percentage of the monetary value of the goods. Where, as here, the "proceeds" of the salvor's find are items uniquely and intrinsically valuable beyond their monetary worth, an award *in specie* is more appropriate. Thus, in this case, should the plaintiff succeed on the merits, it would be awarded a part of those artifacts which had been lost in the ocean depths for over two hundred and sixty-four years, and which, but for the plaintiff's considerable efforts, would otherwise have remained unknown to the terrestrial world. Similarly, that portion representing the State's interest would be in the form of

historical artifacts, not money. It may well be that, where an item of highly unusual historical, cultural, or archeological significance is salved, such a piece might be awarded to the State due to its indivisibility and uniqueness, regardless of the proportion of the total find which it might represent, were an estimate of the monetary value attempted. But clearly, any recovery in this case would be in the form of objects which the plaintiff has brought before the Court; there would be no money judgment to be expended from the State's treasury. Hence, this action is not barred by the Eleventh Amendment.

The claimant State of Florida, while recognizing the unique archeological, historical, and cultural value of the items salved, nonetheless relies upon cases in which money damage awards were sought to support its contention that this action is precluded by operation of the Eleventh Amendment. Thus, the State argues that this suit is barred under the rule set forth in *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). The Supreme Court in that case held that a suit against Indiana revenue officials for a refund of unconstitutionally exacted taxes was barred by the Eleventh Amendment. Obviously, the relief sought and not permitted to go forward in that case was the payment of money directly from the state treasury as a result of the state's past "wrong." *Edelman v. Jordan*, 415 U.S. at 663, 94 S.Ct. at 1355.

The State also cites the Supreme Court decision *In re State of New York*, No. 26 (*The Queen City*), 256 U.S. 503, 41 S.Ct. 592, 65 L.Ed. 1063 (1921), in support of its Eleventh Amendment argument. The Court in that case prohibited the plaintiffs' attempt to recover for damages sustained because of the alleged negligent operation of a steam tug owned by the State in a proceeding brought *in rem* against the tug. In *The Queen City*, the Court held that the Eleventh Amendment barred "the seizure of

---

5. *See The Aquila*, 1C. Rob. 36, 165 Eng.Rep. 87 (1798) (Salvage award appropriate even where

property has accrued to the sovereign).

property owned by a state and used and employed solely for its governmental uses and purposes." 256 U.S. at 510, 41 S.Ct. at 593.

That decision fits squarely within the above-quoted principle of *Edelman*; in *The Queen City*, the Eleventh Amendment barred a suit in which the plaintiff sought monetary recovery for damages allegedly caused by the negligence of a State agent. Although the plaintiff in *The Queen City* attempted to proceed *in rem* as opposed to *in personam*, the nature of the recovery sought, rather than the procedural vehicle employed, resulted in a bar to the action.

Even were the State to "own" the sunken historical artifacts under its statute and the federal Submerged Lands Act (which, under this Court's holding, it does not), the Eleventh Amendment would still pose no bar to this suit, as the objects here at issue are not sovereign property in the sense contemplated in the relevant cases. The Supreme Court in *The Queen City* exempted seizure in admiralty of "public property of a state used and employed for public and governmental purposes." 256 U.S. at 511, 41 S.Ct. at 593. *See also The Fidelity*, Fed.Case No. 4, 758, 8 Fed.Cas. 1189, 1191 (1879) ("Property does not necessarily become a part of the sovereignty because it is owned by the sovereign. To make it so it must be devoted to the public use, and must be employed in carrying on the operations of the government," *citing The Davis*, 10 Wall. 15, 77 U.S. 15, 19 L.Ed. 875 (1869)).

This Court does not deny Florida's right to attempt to preserve cultural and historic resources by the exercise of its police power. *See, e. g., Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). But it is hard to view the items before the Court as "public property used and employed for governmental purposes," when they have lain serenely in their two-hundred-sixty-plus-year habitat, with the State having only recently taken mere verbal action to claim (and no positive steps of its own to locate or raise) these artifacts from the ocean bottom. The State asserts that it

intends to use the items for the benefit of its citizens, for the historic and archeological information and aesthetic beauty they will yield. As noted below in Section III.A. 1.a., at the conclusion of trial, should the plaintiff succeed in this action, the Court—cognizant of the State's valid concern—would certainly fashion relief which would fully recognize the State's historic and cultural interests without interfering with the plaintiff's federal maritime rights. In conclusion, however, the recognition of such interests fails to transform this maritime salvage action into a suit for money damages against the State, such as would be barred by the Eleventh Amendment.

## III. PROPRIETY OF ENTRY OF PRELIMINARY INJUNCTION AGAINST THE STATE'S AGENTS: FOUR ELEMENTS TO BE PROVEN

There are four prerequisites to this Court's granting a preliminary injunction; a showing of all four indicates that an injunction is necessary to preserve the Court's ability to render a meaningful decision on the merits. The four prerequisites are:

(1) A substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the parties or party opposed; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.

*Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel (Treasure Salvors, III)*, 640 F.2d 560, 568 (5th Cir. 1981). The movant must carry the burden of showing all four elements. *Id.*

### A. *The Movant Has Shown a Probability of Success on the Merits*

The movant, plaintiff in the main action, asks this Court to enjoin the agents of the State of Florida from enforcing its laws, which make it a crime for any person who

has failed to obtain a license from the State either to conduct field investigations on any state lands or within designated archeological landmarks, or to alter any archeological site or specimen located on state lands or within designated landmark zones. Section 267.13, Florida Statutes (1979); Fla.Admin. Reg. § 1A–31.12. It is undisputed that both the area explored by the plaintiff and the cargo which the plaintiff has salved are within the territorial limits of the State. The question on which the movant must show a likelihood of prevailing[6] is whether a federal district court sitting under admiralty jurisdiction in a salvage action must give effect to a state law which conflicts with the substantive principles of federal maritime law.

1. *Federal Admiralty Principles, Not the State Statute, Must Govern the Exploration and Salvage of Artifacts Under the Ocean in the Case of a Conflict.*

Florida, by statute and administrative regulation, has enacted a comprehensive scheme designed to acquire and preserve historic sites and property, artifacts, treasure trove, and objects of antiquity of historic value and interest to the public. Generally, the statute declares that such objects which have been abandoned on state-owned submerged lands "shall belong to the state with title thereto vested in the division of archives, history and records management (hereinafter "Division") ...." Section 267.061(1)(b), Florida Statutes (1979). (F.S.)

The statute authorizes the Division to designate archeological sites of significance as "state archeological landmarks," and interrelated groups of such landmarks as "state archeological landmark zones." F.S. § 267.11. It further authorizes the Division to issue permits to qualified parties for excavation and surface reconnaissance on state lands or within landmarks or landmark zones. F.S. § 267.12(1). The statute declares that artifacts recovered belong to the State, F.S. § 267.12(2), and that the Division "may arrange for the disposition of the specimens so collected ...." F.S. § 267.12(3).

Regulations promulgated by the Division define the salvage permit process in more detail, and establish certain conditions which govern the contractees. *See* Appendix B. For purposes of this case, three aspects of the permitting scheme are particularly salient. First is the very requirement that potential salvors be required to obtain a state license to explore given areas of the *navigable waters* over state-owned submerged lands. Second is that, under the State's program, an exclusive right to conduct salvaging operations may be given to one not "actively and ably engaged in reducing" the cargo on a wreck site, once discovered, to possession. Lastly, the statute provides that payment for the recovery of sunken artifacts "shall be made in accordance with the contracts entered into by the Division," which provide, in advance, for a percentage award allocation which fails to reflect individual merit, or lack thereof.

The wreck site from which the plaintiff, Cobb Coin, removed the artifacts now before this Court was, at the time of the lawsuit, the subject of such a lease between the Division and the claimant Quest Corporation. Cobb Coin does not dispute that it was not licensed according to the law of Florida at the time it invoked the admiralty jurisdiction of this Court. But because it appears that Florida's licensing scheme and the criminal penalties imposed for noncompliance therewith conflict impermissibly with federal maritime salvage principles,

6. Some circuits have adopted forms of the so-called "alternative test" for preliminary injunction relief, under which the presence of substantial questions on the merits, combined with the threat of immediate, irreparable injury, may support entry of a preliminary injunction. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C.Cir.1977); *City of Palo Alto v. City & County of San Francisco*, 548 F.2d 1374 (9th Cir. 1977); *Charlie's Girls, Inc. v. Revlon, Inc.*, 483 F.2d 953 (2d Cir. 1973). Certainly, the questions on the merits are substantial enough to require the State to desist in enforcing a criminal statute of questionable validity while this Court makes its final determination.

the Court here concludes, for reasons as follow, that the movant has shown a substantial likelihood of prevailing on the merits in the main cause.

■ This Court takes it as settled doctrine that in admiralty, state·legislation that conflicts with federal maritime principles cannot be given effect under the supremacy clause of the United States Constitution, article VI, paragraph 2. In *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1916), the Court stated the classic rule on this point:

> [W]ell established is the rule that state statutes may not contravene an applicable act of Congress or affect the general maritime law beyond certain limits . . . . And plainly, we think, no such legislation is valid if it contravenes the essential purpose expressed by an Act of Congress, or works material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations.

*Id.* at 216, 37 S.Ct. at 529.

The principle that federal maritime law supercedes inconsistent state law has been followed regularly by the courts. In *Pope & Talbot Inc. v. Hawn*, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953), the Supreme Court held that the maritime rule of comparative negligence governed the parties' liability in action on a maritime tort. The Court specifically held that, "while states may sometimes supplement federal maritime policies, a state may not deprive a person of any substantive admiralty rights as defined in controlling acts of Congress or by interpretive decisions of this Court. These principles have been frequently declared and we adhere to them." 346 U.S. at 409–10, 74 S.Ct. at 205. *See also Messel v. Foundation Co.*, 274 U.S. 427, 434, 47 S.Ct.

695, 698, 71 L.Ed. 1135 (1927); *Carlisle Packing Co. v. Sandanger*, 259 U.S. 255, 259, 42 S.Ct. 475, 476, 66 L.Ed. 927 (1922); *Knickerbocker Ice Co., v. Stewart*, 253 U.S. 149, 159, 40 S.Ct. 438, 439, 64 L.Ed. 834 (1920); *Chelentis v. Luckenbach S.S. Co.*, 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171 (1918). It is equally clear that the dominant federal maritime law derives as much from the rules developed by the American admiralty courts as from Congressional acts. *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 405, 90 S.Ct. 1772, 1790 n. 17, 26 L.Ed.2d 339 (1970) ("Congress has largely left to this Court the responsibility for fashioning the rules of admiralty law. *Fitzgerald v. United States Lines*, 374 U.S. 16, 20 [, 83 S.Ct. 1646, 1650, 10 L.Ed.2d 720] . . . (1963).")

Neither the judicial "limitations" nor the scholarly criticism of the *Jensen* doctrine prevent its application in this case. As is discussed in more detail in Section III.A.2. and 3., *infra*, the cases now permit states to regulate to supplement remedies available to enforce federal rights, *see Just v. Chambers*, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941); *Red Cross Line v. Atlantic Fruit Co.*, 264 U.S. 109, 44 S.Ct. 274, 68 L.Ed. 582 (1924), and to legislate over matters affecting the land and sea and which Congress has either expressly or impliedly left for the states to govern. *See Askew v. American Waterways Operators Co.*, 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973); *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960).[7] But this case involves neither situation, because the state law invades federal rights and, to the extent it governs property lost under the ocean, the legislation is not of the type affecting both land and maritime matters of which the courts have been approving.

---

7. According to Gilmore and Black, discussing "Federal-State Conflict" in the 1975 edition of their treatise:

> All that can be said in general is that the states may not flatly contradict established maritime law, but may "supplement" it, to the extent of allowing recoveries in some cases where the maritime law denies them;

that states may legislate freely on shipping matters that are of predominantly local concern, but that they may not so act as to interfere with the uniform working of the federal maritime system.

Gilmore and Black, The Law of Admiralty, 49–50 (2d ed. 1975).

Scholarly criticism has been aimed mainly at the uncertainty and illogic that resulted from early decisions from which courts inferred that preemption was appropriate even in the absence of a maritime right.[8] The objection voiced by critics was that "[t]he maritime nature of an occurrence does not deprive a state of its legitimate concern over matters affecting its residents or the conduct of persons within its borders." Currie, *Federalism and the Admiralty: "The Devil's Own Mess,"* 1960, The Sup.Ct.Rev. 158, 169.[9] In effect, criticism

of *Jensen* meant that state rules regarding traditional common law matters, particularly torts,[10] should not be frustrated in the absence of an existing contrary federal interest.

The analysis in this case is unaffected by such criticism. First, that criticism is concerned with local matters, those within the traditional common law concerns of the states.[11] Second, it does not question the supremacy of judicially recognized maritime rights in the case of a conflict with state policy.[12] As is discussed in the follow-

**8.** Professor Currie explained the evolution of this "negative implication" read into the Admiralty Clause. At one time, he explained:

While the admiralty adopted with 'alacrity' state statutes giving a right to relief, said Mr. Justice Waite in 1900, state law was never allowed to defeat a right to relief given by the general maritime law. [citation to *Workman v. New York City*, 179 U.S. 552, 563 [, 21 S.Ct. 212, 216, 45 L.Ed. 314] (1900)] . . . This situation seems to have resulted from a conception of the maritime law as an incomplete system, with numerous gaps which could be filled by state statutes or common law, yet supreme in the admiralty court when it afforded a right of action. . . .

One early decision stood out sharply to destroy the symmetry of this simple theory and laid the foundation for the tangle of decisions which now plagues the law: the unanimous decision in *The Roanoke* [, 189 U.S. 185, 23 S.Ct. 491, 47 L.Ed. 770] in 1903 . . . . [I]n *The Roanoke* the Court made explicit for the first time what had been implicit for years: that even where there is no maritime rule, the Admiralty Clause itself has a preemptive, negative effect on state law similar to that of the Commerce Clause.

Currie, *Federalism and the Admiralty: "The Devil's Own Mess,"* 1960, The Sup.Ct.Rev. 158, 166.

**9.** Professor Currie argued that an issue created by a conflict in admiralty between state and federal interests be resolved by a balancing test. He suggested that the inquiry be, as Justice Harlan had at one time stated in dissent but later for the Court in *Kossick v. United Fruit Co.*, 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961), "one involving the nature of the state interest . . . [and] the extent to which such interest intrudes upon federal concerns." Currie, *supra* at 168, *quoting Hess v. United States*, 361 U.S. 314, 331, 80 S.Ct. 341, 352, 4 L.Ed.2d 305 (1960) (dissenting opinion).

Even under such a balancing test, however, Professor Currie conceded that in the case where a federal right supported by a significant federal interest is disrupted by a contrary state

rule, it would be appropriate that it preempt the state law. Section III.A.2. of this Order considers the relative State and Federal interests in this action, following the Supreme Court's analysis in *Kossick*. This Court there concludes that considering the relative interests asserted in this case, application of federal salvage rules is appropriate.

**10.** Professor Robertson, recognizing that the choice between uniformity and diversity in a federal system will usually be a difficult one, argued that the history of maritime personal injury law indicated that diversity was preferable to uniformity in that area. Yet he also recognized that "[t]here are obviously many topics now covered by the general maritime law as to which state experimentation would be conceded by everyone to be inappropriate." Robertson, Admiralty and Federalism 282 (1970). Surely, salvage law is such a topic.

In 1950, Professor Black suggested that the basic jurisdictional allocation be changed to transfer maritime personal injury cases to the state courts, and to retain contractual, commercial, and property adjustment cases, "necessity for which grows out of the conduct of the maritime industry," in the federal district courts sitting in admiralty. Black, *Admiralty Jurisdiction: Critique and Suggestions*, 50 Colum.L.Rev. 259, 276 (1950). But even Professor Black did not go so far as to suggest a change in the applicable substantive law: "Naturally, nothing would happen to the underlying choice of law problem . . . ." *Id.* at 278–79.

**11.** Currie, *supra*, at 179.

**12.** "[T]he proposition [has] never seriously [been] disputed in admiralty courts and established for over forty years without exception even as to state courts, that state law may not be applied in derogation of a right of recovery afforded by the general maritime law." *Id.* at 181, *citing Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942) and *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

ing section, there is a battery of federal salvage rules with which Florida's law conflicts, which because of the dominant federal interest must be given effect notwithstanding the contrary state law.

■ This case is premised, in part, on an *in rem* action against the items which the plaintiff has brought up from the ocean for a salvage award. An *in rem* action for a salvage award against artifacts recovered from the remains of a centuries-old shipwreck states a claim within this Court's admiralty jurisdiction. *Platoro Ltd., Inc. v. Unidentified Remains of a Vessel*, 614 F.2d 1051, 1055 (5th Cir. 1980), *citing Treasure Salvors, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330 (5th Cir. 1978) (*Treasure Salvors I*).

A long tradition of federal maritime salvage law has grown out of the cases arising under the federal admiralty and maritime jurisdiction. Among these are at least three principles which conflict irreconcilably with Florida's attempt to govern the historically significant sunken cargo abandoned in the ocean within its territorial limits.

a. *The Florida Statute Forbidding Exploration Except to Licensees Violates Potential Salvors' Rights to Explore the Ocean for Salvageable Sites*

■ Florida's statutory scheme violates the maritime law, which permits any potential salvor to search and explore the open waters for salvageable goods. The right so to search is a fundamental adjunct to the American principle that the high seas be freely navigable to all seafaring persons to navigate for pleasure or commerce, or otherwise to ply their trades. *See, e. g., United States v. California*, 322 U.S. 19, 34, 67 S.Ct. 1658, 1666, 91 L.Ed. 1889 (1947) ("This country, throughout its existence has stood for freedom of the seas, a principle whose breach has precipitated wars among nations."); Gilmore and Black, The Law of Admiralty 535 (2d ed. 1975) ("When property has been abandoned or become derelict, anyone may put himself forward as salvor"). *Cf. United States v. Alaska*, 422 U.S.

184, 199, 95 S.Ct. 2240, 2251, 45 L.Ed.2d 109 (1975) (freedom of fishing on the high seas).

Florida's Archives and History Act forbids any person "to conduct field investigations on any land owned or controlled by the state or its departments . . . or within the boundaries of any designated state archeological landmark or landmark zone without first obtaining a permit or having first received from the division a notice to proceed . . . ." Section 267.13(1), Florida Statutes (1979). As the Division has interpreted the law, "[s]tate lands include the submerged lands under the Atlantic Ocean extending seaward from the Florida coastline for a distance of three geographic miles . . . ." *See* Warning Against Unauthorized Exploration and Salvage, issued by the Florida Marine Patrol, June 23, 1981, File Item # 177, Exhibit B of Plaintiff's Application for Temporary Restraining Order and Motion for Preliminary and Permanent Injunction and Other Relief. Thus, as the above-cited warning indicates, Florida purports to outlaw both exploration and salvage on the navigable waters of the ocean within the three-mile territorial limit by persons who are not licensed by the State. *See also* Fla.Admin.Reg. § 1A–31.01, .12.

■ The requirement that one be licensed to be able to explore the ocean for abandoned property at the bottom contravenes the maritime law principle that potential salvors be free to explore the open waters. While salvage law will permit one whose salvage efforts are continuous and reasonably diligent to work a wrecksite, once discovered, to the exclusion of others, *see* discussion in Section III.A.1.b., *infra*, until discovery and subsequent dominion of the site occurs, no one may be restricted from exploring the navigable waters for salvageable sites. In this aspect, the Florida act and regulations are contrary to established maritime law.

■ Although Quest claims possession of the wreck under the color of title conferred by the State's lease, it did not invoke the Federal Court's jurisdiction for a sal-

vage award for the few items it salved.[13] Further, this Court finds that Quest's possession and salvage operations were insufficient to give it the type of right to exclude competing salvors required by federal maritime law. *See* Section III.A.1.b., *infra.* Hence, Cobb Coin had the right under federal maritime law to search and salve the Corrigan site, and to discover, and pull up that first cannon and all subsequent artifacts which have, in this proceeding, been brought before the Court.

### b. *Under the Florida Licensing Scheme, Unmeritorious Salvors May be Granted Exclusive Rights to Salve in Contravention of the Maritime Law*

Florida's regulatory program violates the uniform maritime law by permitting its licensees exclusive rights to salve an area regardless of the licensee's diligence or success. As recognized by the Fifth Circuit in *Treasure Salvors III*, it is axiomatic that "the law of maritime salvage and finds . . . protects the right of a salvor who undertakes a project to carry it to completion without interference from others who seek to share in the enterprise and the reward . . . ." 640 F.2d at 567. However, in order to enjoy a continued right to exclusive possession, the salvor must exercise due diligence and be reasonably successful in his attempts to save the subject property.

Under the maritime rule, in order for a salvor to receive an exclusive right to salve a wreck site

the salvor must manifest an intent to reduce the property to physical possession by dealing with the wreck as a whole in a way that would tend to warn, if not exclude, subsequent salvors.

Most courts have required the presence of an intent to possess, and although not insisting on physical possession, do seem to demand an actively exploitative approach by the would-be salvor.

Lawrence, *State Antiquity Laws and Admiralty Salvage: Protecting Our Cultural Resources*, 32 U.Miami L.Rev. 291, 295 (1978) (citations omitted). As the Fifth Circuit has stated:

A salvor . . . has a valuable interest in his salvage operation which the law protects by vesting in the salvor certain rights. Among the most important of these rights are the right to exclude others from participating in the salvage operations, so long as the original salvor appears ready, willing and able to complete the salvage project.

*Treasure Salvors III*, 640 F.2d at 567.

Thus, one who discovers, yet does not assiduously undertake to rescue, abandoned property may lose his right to uninterrupted salvage operations. The case of *Brady v. S.S. African Queen*, 179 F.Supp. 321 (E.D.Va.1960) is illustrative of this point. In *Brady*, the intervening libellant, Warner, based his claim solely on the strength of having first boarded the stern of an abandoned vessel which had broken in half while sinking. He had run an advertisement in the *Salisbury Times* asserting his alleged "lawful right of sole and exclusive possession of the *entire* vessel, when, in fact, Warner had not been within two miles of the bow section at the time." *Id.* at 323 (emphasis in original). The Court refused to recognize Warner's interest, concluding that:

A salvor cannot assert a claim merely by boarding a vessel and publishing a notice, unless such acts are coupled with a then present intention of conducting salvage operations, and he immediately thereafter proceeds with activity in the form of constructive steps to aid the distressed property. When he finally determines that he will, in good faith, conduct such operations and pursues his constructive steps, he is then, and only then, in a position to assert his claim subject to the rights of others which may have inter-

---

**13.** Quest claims to have recovered sixteen (16) silver coins from the wreck site in its two years of salvage operation, under the exclusive State lease it held. The State's representative testi-

fied Quest found nine (9). The coins were turned over to the State for safekeeping; they have since disappeared.

vened while he is exploring the prospects of such operations.

*Id.* at 324.

In *Eads v. Brazelton*, 22 Ark. 499 (1861), as in *Brady*, the intervening libellant was a salvor who had first been at the salvage site. In *Eads*, the intervenor, Brazelton, had attached a buoy to a weight resting on the wreck, a sunken barge in the Mississippi River, thus indicating his apparent intention to return to the site. However, Brazelton failed to return until some nine months later, because, after being distracted by a different salvage project, he was impeded in his return to the site by a rise in the river. While Brazelton was finally on his way back, Eads's salvage vessel overtook Brazelton's, and, arriving first at the site, Eads stationed his boat over the barge and began to raise its cargo of lead.

The Arkansas Supreme Court, rejecting Brazelton's claim to the cargo recovered by Eads, reasoned that, although Brazelton had indicated the wreck site and had intended to return to conduct salvage operations, he failed to "[attain] to the possession of the wreck," and "therefore had no title to it by occupancy." *Id.* at 511. In so concluding, however, the court emphasized that, had Brazelton "merely placed 'his boat over the wreck, with the means to raise its valuables, and with persistent efforts directed to raising the lead,' he would have been deemed to have a legally protected possessory interest in the wreck and Eads would have had no right to interfere with that possession by undertaking his own salvage operations." *Treasure Salvors III*, 640 F.2d at 571, *quoting Eads v. Brazelton*, 22 Ark. at 511.

■■■■ As demonstrated in *Brazelton* and *Brady*, the rights of a "first finder" who abandons his claim inure to the benefit of any finder who diligently undertakes the salvaging operation. "Notorious possession, with the avowal of the object of such possession, are cardinal requisites to the creation or maintenance of the privileges of a salvor. Where they do not exist, any per-

son may take the property with all the advantages of the first finder." Marvin, A Treatise on the Law of Wreck and Salvage, 138 (1858).[14]

■■■■ The federal maritime rules governing salvors' rights are fair and flexible. According to the Fifth Circuit, "equitable considerations come into play in determining the legal protection afforded a finder." *Treasure Salvors III*, 640 F.2d at 573. Thus, for example, if a salvor vacates a site for any legitimate reason with an intention to return with reasonable diligence, that absence will not result in the forfeiture of a finder's rights. As Judge Marvin said in his 1858 treatise:

> Persons who have taken the actual possession of a derelict with the means and for the purpose of saving it, do not lose their right of possession by temporarily leaving it with an intention of returning and resuming the actual possession. But their absence must be with an intention of returning, and strictly temporary and for a justifiable cause, otherwise they will lose their right to prior possession. They acquire no right of possession, which they can maintain by a kind of continued claim, by discovery merely, without keeping the thing in possession, or applying constant exertions for the preservation and rescue.

W. Marvin, *supra* at 137–38.

In *Rickard v. Pringle*, 293 F.Supp. 981 (S.D.N.Y.1968), the court recognized Rickard's continued right as first finder to exclusive occupancy of the wreck site where he had left the location of the sunken steamship solely for the purpose of obtaining equipment capable of raising the propeller which he had already successfully detached. While Rickard was gone, Pringle moved in with effective equipment and hauled off the propeller, which he then sold. The court upheld Rickard's claim for the proceeds, finding that despite his temporary absence, Rickard was "successfully prosecuting the salvage operation and did not

---

14. Judge William Marvin served as a Judge of the United States District Court for the South-ern District of Florida, at Key West, from 1847 to 1863.

abandon it at any time and thus was entitled to the rights of a first salvor legally in possession." *Id.* at 984.

Comparing these principles with the State licensing program, it is readily apparent that, at least for the period of his lease with the State, a salvor's diligence in conducting his operations is irrelevant to his continued exclusive right to work a particular wreck site. Contrary to federal salvage principles, after an initial assessment of a prospective salvor's apparent abilities, the State's lessee is permitted sole occupancy of a wreck site regardless of his diligence.

██ In order to claim an exclusive right to conduct salvage operations on a particular site, it is a further requisite, under federal maritime law, that a salvor be able to render effective assistance to the distressed property. In other words, in order to maintain exclusive possession, a salvor must be not only willing and diligent, but capable of actually saving the goods. *See generally* 3A Benedict on Admiralty §§ 150–54.

Thus, while the first salvor is normally favored under federal salvage principles, he may lose that advantage by his failure to complete the task undertaken. *Id.* at 152. An English case, *The American Farmer*, 80 Ll.L.Rep. 672 (1947), exemplifies this principle. There, "the first salvor was willing in spirit, but not capable in fact of successfully rescuing the distressed property." 3A Benedict on Admiralty § 153 at p. 11–7.

The American Farmer was an 8000-ton vessel which was left derelict after colliding with another vessel in the North Atlantic. The Farmer had not yet sunk when it was discovered by the crew of the 2000-ton steamship Elizabete. The crew began operations to save the disabled vessel by putting some of her members aboard the Farmer and attaching lines for the purpose of towing it. During the course of these efforts, however, a sistership of the Farmer, The American Ranger, arrived, and several members of that vessel's crew also boarded the Farmer. Even though the Elizabete was already towing the Farmer at a speed of two knots, the Ranger's crewmen, familiar with the Farmer's mechanism, were able to raise steam and get the Farmer into reasonable working order. They then attached lines from the Ranger to the Farmer, severed the lines from the Elizabete, and proceeded, in her stead, to tow the Farmer into port. The Elizabete's master thereafter sought full recovery for the Farmer's salvage, taking the position that having gotten possession of the derelict vessel he was entitled to retain possession against all comers:

> While that attitude was understandable to the court, it was held, however, that the Elizabete was inadequately provisioned with fuel so that she would not have been able to complete the tow before running out of steam. The court alluded to the principle that a subsequent salvor is not entitled to dispossess a prior salvor if the prior salvor has a reasonable prospect of accomplishing the salvage service himself and is not endangering the safety of the salved property. Under the circumstances in this case, the master and crew of the American Ranger were entitled to take over the rescue of the Farmer, even to the extent of cutting the Elizabete's lines. Rewards were granted to the officers and crew of both the Elizabete and the American Ranger.

3A Benedict on Admiralty § 153 at p. 11–8.

Florida's statutory and regulatory salvage scheme is inconsistent with these principles. Under the State's leasing program, once a salvor is preliminarily approved by the Division, the exclusive right to salvage he acquires is safeguarded regardless of his subsequent success, or lack thereof, during the period of the lease. Such a result is contrary to admiralty's "diligence" ethic, which underlies a policy of encouraging the careful, effective, and expeditious retrieval of goods which have been abandoned at sea.

The facts in this case aptly demonstrate how the State regulatory system impedes the avowed goals of the statute, and the goals of the maritime law. The State's lessee, Quest Corporation, had the exclusive right to work the Corrigan site, which right the State was willing to back up with the muscle of its criminal law enforcement sys-

tem. Yet the evidence shows that Quest actually worked the site only forty-nine (49) days in two years. Moreover, Quest's salvors chose to work other sites in the area, consciously ignoring Corrigan's Site despite beneficial salving conditions on a number of occasions. When it did attempt to work Corrigan's, it was notably unsuccessful in bringing up treasure or other items of historical or archeological significance. Quest's demonstrated indifference toward working the Corrigan Site proves better than any theoretical discussion that the application of maritime principles most ably serves society's interests in producing lost or abandoned property for the benefit of commerce and culture. *See also* Section III.C. and D., *infra.*

c. *Florida's System of Fixed Salvor Compensation Conflicts with Admiralty's Flexible Method of Remuneration Based on Risk and Merit*

Florida's regulatory scheme conflicts with federal maritime law in a third aspect—i. e., in the designated method for determining salvage awards. The statute is silent about the share of sunken artifacts that salvors will receive. The regulations implementing the statute provide that all such artifacts "belong to the State of Florida, and payment for the recovery of such material shall be made in accordance with the contracts entered into by the Division." Fla.Admin.Reg. § 1A–31.09. The evidence shows that most contracts provide for a 75%–25% division between the salvor and the State. This aspect of Florida's regulatory scheme conflicts with the maritime law's flexible and equitable approach to compensating salvors.

The plaintiff, in seeking a salvage award for the cannon it pulled up on August 20, 1979, properly invoked the admiralty jurisdiction of this Court. Under traditional salvage rules, the salvor receives a lien against the salved property, *The Sabine*, 101 U.S. 384, 25 L.Ed. 982 (1879); 3A Benedict on Admiralty §§ 137, 143, at pp. 10–1, 7; Gilmore and Black, The Law of Admiralty 628 (2d ed. 1975), and is usually entitled to his expenses plus a salvage award, *see* Gilmore and Black, *id.* § 8–9, at 562–63 and cases cited therein at n. 92. "It is basic that more than a *quantum meruit* is involved; salvors are to be paid a bonus according to the merit of their services." *Id.* [15] Awards vary according to a judge's "conclusion that the salvage service was of 'high order,' 'medium order,' or 'low order' . . . ." *Id.* In the case of abandoned property, the entire value of the salved property may be awarded a salvor. *Id.* at § 8–10, p. 563 and n. 92a.[16] The consistent policy underlying admiralty's salvage awards is that salvors will be liberally rewarded. Admiralty holds out a continuing incentive to undertake the physical and financial risks entailed in salvage operations and to bring the property thus recovered into court for a salvage determination. Marine treasure salvors—whether in the Gulf of Mexico, the North Atlantic, or the Gulf Stream, whether within or beyond state territorial waters—are well aware of this policy, and are guided by its constancy.

This Court need not now decide whether a 75%–25% split is appropriate under these, or any other, circumstances. Such an allocation could conceivably be unfair to either

---

**15.** According to the Supreme Court of the United States:

Courts of Admiralty usually consider the following circumstances as the main ingredients in determining the amount of the reward to be decreed for a salvage service: (1) The labor expended by the salvors in rendering the salvage service. (2) The promptitude, skill and energy displayed in rendering the service and saving the property. (3) The value of the property employed by the salvors in rendering the service and the danger to which such property was exposed. (4)

The risk incurred by the salvors in securing the property from the impending peril. (5) The value of the property saved. (6) The degree of danger from which the property was rescued.

*The Blackwall*, 77 U.S. (10 Wall.) 1, 14, 19 L.Ed. 870 (1869).

**16.** The State claims ownership of this abandoned property both by statute and by its filing of a claim in this action; this ownership claim is discussed *supra*, Section II.B., in relation to Florida's Eleventh Amendment argument.

the salvor or the claimant, depending on the effort and costs expended by the salvor, and the nature or value of the salved items before the court.[17] As stated by Judge Marvin:

> The value of the property saved is often an important ingredient in determining the amount of salvage. The remuneration to the salvor and benefit to the owner are always larger where the property that receives assistance is large than where it is small; and *vice versa*. The rule of decision is, not a proportion, although the amount may be and often is expressed in that form in the decree, but an adequate reward. Where the value of the property is small and the services great, an adequate reward cannot always be given; but where the value is large, it may be given without casting a heavy burden upon the property. In many cases, where the value is known to be large and the service small, a proper remuneration may be made without ascertaining the precise value.

W. Marvin, A Treatise on the Law of Wreck and Salvage, 122–23 (1858).

Further, apportionment of salvage is "often varied according to circumstances, so as to reward superior zeal, energy, and gallantry, and to discourage indifference and selfishness." *Id.* at 248. Thus, the relative merit of the salvor's endeavors enters into the Court's application of the "peculiar system awarding the compensation" in salvage actions:

> As salvage is a compensation for meritorious services, it may properly be increased, diminished, or wholly forfeited, according to the merit or demerit of the salvor, in his relation to the property saved. In the case of Schooner Boston, in which the salvor was charged with embezzlement of the goods while in the marshal's custody, Justice Story said: "I take it to be very clear, according to the course of admiralty proceedings, that no person can come into that court and ask its assistance, unless he can, *ex aequo et bono*,

make out a case fit for its interposition. A court of admiralty is to the extent of its jurisdiction, at least in cases of this sort, a court of equity; and the same applies here, as in other courts of equity; that the party who asks aid, must come with clean hands. In cases of salvage, the party finds himself upon a meritorious service, and upon the implied understanding, that he brings before the court for its final award all the property saved, with entire good faith; and he asks a compensation for the restitution of it, uninjured and unembezzled by him. The merit is not in saving the property alone, but in saving it and restoring it to the owners. The compensation to be awarded, therefore, presupposes good faith, meritorious service, complete restoration, and incorruptible vigilance, so far as the property is within the reach, or under the control of the salvors. What claim could be more extraordinary than an annunciation by a salvor in a court of justice, that he had saved the property, and had afterwards a gross fraud or theft upon the owner, for the purpose of withdrawing the property from his; and then to ask in the same breath for a compensation for his labor, notwithstanding his iniquity? Such a claim, it seems to me, would be at war with the first principles of justice, and certainly with those of all maritime jurisprudence."

*Id.* at 226–27, *citing* 1 Sumner, 341.

■ Thus, there can be no suggestion that federal admiralty procedures sanction salvaging methods which fail to safeguard items and the invaluable archeological information associated with the artifacts salved. Admiralty's policy of weighing the merit of the salvors' service in determining an appropriate award has, since the establishment of the federal courts, been "a wholesome doctrine, and it makes it the interest, as well as the duty, of salvors to act with good faith, and never to sleep on their posts, or to make a merit of their frauds." W. Marvin, *supra*, at 227.

---

17. As indicated in the Eleventh Amendment discussion, a salvage award and the State's share in a case like this would be in the form of actual items recovered, not money.

**2.** *Even Under the Strict Interest Balancing Test of Kossick v. United Fruit Co., the Federal Interest in a Uniform Maritime Law Requires that Federal Salvage Law, Not the State Statute, be Applied in this Case.*

■ In summary, the Florida regulatory scheme conflicts directly with at least three characteristic features of the federal maritime law. *Jensen* and its progeny, even as perhaps modified by later cases and criticism, require that the maritime principles govern in the case of such a conflict. It is also clear that the federal interest in protecting those maritime rights outweighs the federalism considerations that ordinarily call for every presumption in favor of enforcing state statutes. The Supreme Court's analysis in *Kossick v. United Fruit Co.*, 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961), although probably stricter than is required in this case, is nonetheless instructive in this matter.

In *Kossick*, the Court held that an action on an oral contract by a ship's steward against his employer was governed by the maritime rule validating oral contracts, not the state statute of frauds, when the contract arose out of the employer's federal duty to provide the steward with maintenance and cure. It recognized that a balancing process is appropriate in the case of a conflict between remedies available for the enforcement of a federal right, requiring a weighing of the possible interference with federal uniformity against the importance of the state's interests: [18]

Although the doctrines of the uniformity and supremacy of the maritime law have been vigorously criticized—see *Southern Pacific Co. v. Jensen*, supra, 244 U.S. at page 218, 37 S.Ct. at page 530 (dissenting opinion); *Standard Dredging Corp. v. Murphy*, 319 U.S. 306, 309, 63 S.Ct. 1067, 1068, 87 L.Ed. 1416—the qualifications and exceptions which this Court has built up to that imperative doctrine have not been considered notably more adequate.

See Gilmore and Black, Admiralty, passim; Currie, Federalism and the Admiralty: "The Devil's Own Mess," 1960, The Supreme Court Review, 158; The Application of State Survival Statutes in Maritime Causes, 60 Col.L.Rev. 534. Perhaps the most often heard criticism of the supremacy doctrine is this: the fact that maritime law is—in a special sense at least, *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368—federal law and therefore supreme by virtue of Article VI of the Constitution carries with it the implication that wherever a maritime interest is involved, no matter how slight or marginal, it must displace a local interest, no matter how pressing and significant. But the process is surely rather one of accommodation, entirely familiar in many areas of overlapping state and federal concern, or a process somewhat analogous to the normal conflict of laws situation where two sovereignties assert divergent interests in a transaction as to which both have some concern.

*Kossick*, 365 U.S. at 738–39, 81 S.Ct. at 892.

In *Kossick*, a number of considerations justified the application of maritime law. First, the contract under consideration by the Court was presumed to be valid, as it had been entered into voluntarily, rather than in fulfillment of any government-imposed obligation. This case has no parallel consideration, except perhaps for the general presumption that state statutes are valid. This Court recognizes that presumption and validity to the extent not in conflict with the paramount federal law.

Second, the Court considered that, as sailors of any nationality could join a ship in any port, the validity of agreements arising from maritime employment should be judged by one uniform law, regardless of where the agreement was made. Similarly, the happenstance of geographical location is not sufficient to justify a proliferation of rules governing the salvage of historic arti-

---

**18.** One scholar has described Justice Harlan's opinion in *Kossick* as being "as careful and specific an explanation of the interest-balanc-ing process in personal injury cases as has been ventured in any of the cases." Robertson, Admiralty and Federalism 255 (1970).

facts lying beneath the navigable seas of this country. One law should govern a salvor's rights, whether the winds of fate have dashed a particular ship's hopes on the New England rocks, on the coral reef, in the Bermuda Triangle, or in the sandy bottom near Florida's Sebastian Inlet. And certainly, the rules governing a salvor's rights to search and be rewarded should not depend upon the historical accident whereby a ship's remains and cargo—often, over two centuries before—have come to rest either inside or outside what later became a particular state's three-mile territorial boundary. Given the admiralty court's equitable power to fashion relief appropriate for safeguarding the individual interest which a state might seek to obtain through its laws, *See* Section III.A.1.c., *supra,* the uniform maritime rights accorded salvors should not be denied.

In the third consideration in *Kossick,* the Court noted that the contract at issue was not "peculiarly a matter of state and local concern," 365 U.S. at 741, 81 S.Ct. at 893.[19] That is, New York's interest in not lending her courts to the accomplishment of fraud was insufficient to overcome the countervailing federal considerations. In this case, Florida's interest is in obtaining and preserving cultural and historic artifacts. This requires successful salvage operations by qualified and honest salvors who properly record the location[20] of each artifact and who can be trusted not to secrete salved items. But these interests are also the interests of the federal maritime law, and the federal courts can ensure their protection while observing the paramount federal rights of salvors. As already mentioned, this Court recognizes that an award to the

State of a portion of the historically significant items brought here, to be preserved for the people, might be appropriate. In the hearing on this motion, there was no evidence, nor even an allegation, that Cobb Coin is incompetent or dishonest; it is, in fact, a very successful salvor, and it has brought the salved items into this Court as is required under the admiralty law.[21] Beyond this case, maritime salvage rules in general provide for the protections about which Florida is concerned. Under salvage principles salvors are required to bring their finds into court for a division, where they are liberally rewarded for their honesty in so doing. *See The Blackwall,* 77 U.S. (10 Wall.) 1, 12, 19 L.Ed. 870 (1869). A further requirement is that salvors be successful, or at least capable, in their efforts to salve a wrecksite, in order to invoke the court's protection. The admiralty system is thus more productive because one must bring up items to remain entitled to salve, and admiralty adequately protects against possible salvor dishonesty.[22]

Concluding its analysis, the Court in *Kossick* distinguished that case from cases which gave effect to state rules touching maritime concerns. First, *Kossick* was not analogous to "cases such as *Red Cross Line v. Atlantic Fruit* [264 U.S. 109, 44 S.Ct. 274, 68 L.Ed. 582 (1924)], or *Just v. Chambers* [312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941)], where state law had the effect of supplementing the remedies available in admiralty for the vindication of maritime rights." 365 U.S. at 741–42, 81 S.Ct. at 893–94. In *Red Cross Line,* the Court upheld the power of a state court to decree specific enforcement of an arbitration clause in a maritime contract reasoning that such clauses are valid in admiralty and

---

**19.** In *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.,* 429 U.S. 363, 378, 97 S.Ct. 582, 591, 50 L.Ed.2d 550 (1977), the Supreme Court held that state law should govern a question of title to real property resulting from the changed course of a navigable river that was not an interstate boundary. "[S]tate law governs issues relating to ... real property, unless some other principle of federal law requires a different result."

**20.** The technical term for information concerning the exact location, depth, etc. of the artifacts is "archeological provenience."

**21.** Further, Florida has, in the past, frequently licensed Mr. Fisher's salvage companies, so any assertion of his dishonesty would be specious.

**22.** Pursuant to the State's motion for an injunction, the Court instead ordered that a State agent be present on the plaintiff's salvage vessels for purposes of documenting each artifact that is recovered.

that to compel arbitration was only to provide a remedy unavailable in admiralty. 264 U.S. at 123, 44 S.Ct. at 276–77. Similarly, in *Just v. Chambers*, the Court applied a Florida statute providing for the survival of a wrongful death action following the death of the tortfeasor in an admiralty action, holding that it worked no prejudice to the characteristic features of the maritime law.

The distinction between such cases is even more stark in this case than in *Kossick*. The Florida statute does not supplement federal remedies; it directly conflicts with and deprives salvors of a number of federal maritime rights. It works material prejudice to the characteristic features of the maritime law which allows freedom to explore the high seas, requires diligence on the part of salvors working a site, and rewards salvage efforts on a case by case basis depending on the circumstances of the particular salvage services. To the extent it so interferes, the statute cannot be given effect by this Court.[23]

This Court notes that the facts in *Kossick* involve a subject more closely related to the states' traditional common law concerns— the enforceability of an oral contract—than the facts in this case. The claim of a salvor to an award from items recovered from the ocean is uniquely maritime. Therefore, the *Kossick* analysis is arguably a stricter test than is necessary in this case given *Jensen's* command. But even the application of the stricter *Kossick* interest balancing test suggests the choice of federal law, and that reinforces this Court's conclusion that the maritime law must govern this case.

3. *This Case is Not Like Those Validating State Police Power Regulations Which Merely Affect Maritime Concerns; Here the Florida Statute Interferes With Substantial Existing Federal Maritime Rights.*

This case does not fall within the class of cases validating states' exercises of their police powers notwithstanding some impact on maritime concerns. Those cases have in common the following distinguishing elements. First, the rules there considered pertained either to matters closely related to land or to health, safety, or other concerns within the state's traditionally recognized police power. Second, and more importantly, in no such case did the rules in question directly conflict with applicable federal principles.

In *Skiriotes v. State of Florida*, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941), the Supreme Court upheld a Florida criminal statute which proscribed the use of certain deep-sea diving apparatus for the purpose of taking commercial sponges from the Gulf of Mexico. There was a federal statute governing the size of sponges that could be taken from the Gulf of Mexico, but it was silent as to the apparatus which could be used. The Court upheld Florida's power to supplement Congressional legislation covering but a limited field, adding: "It is also clear that Florida has an interest in the proper maintenance of the sponge fishery and that the statute so far as applied to conduct within the territorial waters of Florida, in the absence of conflicting federal legislation, is within the police power of the state." 313 U.S. at 75, 61 S.Ct. at 928.

Clearly, natural resource conservation is one of the areas in which the states have traditionally exercised broad police powers. *See* discussion in Section III.A.4., *infra*. In *Skiriotes*, however, the statute did not conflict with any of the recognized principles of maritime law. Thus, the Court's statement that "there is nothing novel in the doctrine that a State may exercise its authority over its citizens on the high seas," 313 U.S. at 77, 61 S.Ct. at 929, is inapposite to the instant case.

In *Kelly v. Washington ex rel. Foss Co.*, 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3 (1938), the

---

**23.** The Court in *Kossick* also distinguished the case from *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), in which "the application of state law was justified . . . on the basis of a lack of any provision of maritime law governing the matter there presented." 365 U.S. at 742, 81 S.Ct. at 894. As the discussion above indicates, there is no absence of substantive maritime law in the instant case.

Court found state laws regulating vessel safety and seaworthiness to be within the state's police powers. It held: "In such a matter, the state may protect its people without waiting for federal action providing the state action does not come into conflict with federal rules." 302 U.S. at 15, 58 S.Ct. at 94.

In *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960), the Supreme Court held that Detroit's local pollution control laws were not preempted by less strict federal standards governing seagoing vessels. The two sets of rules evaluated by the Court in that case sought to regulate different evils: the federal rules were designed to promote navigational safety, while the local ordinance was designed to promote health and cleanliness. In declining to invalidate the state scheme, the Court was persuaded by three pertinent factors. First, the Court recognized health protection as among those interests generally considered to be within the states' traditional police powers:

> The ordinance was enacted for the manifest purpose of promoting the health and welfare of the city's inhabitants. Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power.

362 U.S. at 442, 80 S.Ct. at 815. Second, the Court concluded that "Congressional recognition that the problem of air pollution is peculiarly a matter of state and local concern" had been manifested in federal pollution control laws. 362 U.S. at 446, 80 S.Ct. at 817. Third, in the Court's judgment, the local ordinance imposed no undue burden on the uniformity required for interstate commerce. 362 U.S. at 448, 80 S.Ct. at 818. The Court therefore upheld the law and affirmed a shipper's conviction thereunder.

None of the considerations that governed *Huron* obtain in this case. Here, Florida's statute, unlike the local ordinance in *Huron,* purportedly governs many of same activities already governed by existing maritime salvage rules. None of the statutes cited by the State evidence an intent on the part of Congress to delegate the power to regulate salvage of historic artifacts to the states. *See* Section III.A.4., *infra.* Further, the regulation of recovery of ancient artifacts is not as traditional a matter within states' police power as are health and safety. Although the Supreme Court has recognized historic preservation as a valid state concern, a state may not enact legislation in that area in such a way as to interfere, as do portions of Florida's licensing statute, with the uniformity required by maritime law.

The most recent decision deferring to state law despite some overlap with federal maritime law is *Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973). The Court in that case upheld a Florida statute which imposed a number of regulations on the oil trade, including strict liability "for any damage incurred by the State or private persons as a result of an oil spill in the State's territorial waters from any waterfront facility used for drilling for oil or handling the transfer or storage of oil (terminal facility) and from any ship destined for or leaving such facility." 411 U.S. at 327, 93 S.Ct. at 1593.

After finding no conflict between the State law and any applicable act of Congress, the Court considered whether the law was within the area in which "a State constitutionally may exercise its police power respecting maritime activities concurrently with the Federal Government." 411 U.S. at 337, 93 S.Ct. at 1598. The Court determined that the state regulation was valid as one "traditionally within the competence of the States," after concluding there was no "clear conflict with the federal law." 411 U.S. at 341, 93 S.Ct. at 1600.

Unlike the statute here involved, the state rules at issue in *American Waterways* (as in other cases where state law has been applied) governed matters well within the traditional concepts of the state's police power, and did not interfere with the operation of federal law. The Court in *American Waterways* expressly relied upon the *Huron*

and *Kelly* decisions in focusing on the relation of the pollution control laws to the traditional police power, 411 U.S. at 343, 93 S.Ct. at 1601, and indicating the absence of a conflict with federal principles, 411 U.S. at 342, 93 S.Ct. at 1600.

■ Construed most favorably toward the State, *American Waterways* stands for the proposition that a state law relating to subjects within its police power and otherwise not preempted

> is valid unless the rule of *Jensen* and *Knickerbocker Ice* is to engulf everything that Congress chose to call "admiralty", preempting state action. *Jensen* and *Knickerbocker Ice* have been confined to their facts, *viz.*, to suits relating to the relationship of vessels, plying the high seas and our navigable waters, and to their crews.

411 U.S. at 344, 93 S.Ct. at 1601. Thus, under the broadest reading of *American Waterways*, it may be said that the line of cases in which a negative implication in the admiralty clause was found to invalidate state laws even in the absence of a pertinent federal rule has been overturned. *See,* e. g., Currie, *Federalism and Admiralty: The Devil's Own Mess,"* 1960, The Sup.Ct. Rev. 158, 170–71; Robertson, Admiralty and Federalism 187 (1970). No such void exists here; the salvage principles with which the state statute conflicts are well-established in the maritime law. Federal salvage law is central to the body of "customs and ordinances of the sea" recognized by even the most ardent critics of *Jensen*, 244 U.S. at 220, 37 S.Ct. at 530 (Holmes, J., dissenting), and must preempt inconsistent state laws. *See* Black, *Admiralty Jurisdiction, Critique and Suggestions*, 50 Colum.L. Rev. 259, 275 (1950). *See also Treasure Salvors III*, 640 F.2d at 567 ("the principles

of salvage are part of the *jus gentium*, i. e. the international maritime law . . . .").

The Court in *American Waterways* concluded: *"Jensen* thus has vitality left. But we decline to move the *Jensen* line of cases shoreward to oust state law from any situations involving shoreside injuries by ships on navigable waters." 411 U.S. at 344, 93 S.Ct. at 1601. The Court's express reticence to upset a state's exercise of its recognized police powers—particularly regarding activities affecting the land—does not come into play in this case. This case concerns cargo of once-seagoing vessels now lost beneath the navigable waters, and the right of salvors to search for and rescue those items and to be rewarded for their efforts. Where, as here, the federal rules applicable to the field are clear and well-established, *Jensen* and its progeny require that inconsistencies in state laws be supplanted by the federal maritime law.

4. *Under Applicable Maritime Principles of Salvage and the Law of Finds, Cobb Coin Has Met its Burden in Demonstrating Likelihood of Success on the Merits.*

■ Under the prevailing "American" rule regarding ownership of lost or abandoned property, in the absence of an express statutory claim by the sovereign, abandoned goods successfully recovered become the property of the salvor.[24] *See generally* Lawrence, *State Antiquity Laws and Admiralty Salvage: Protecting our Cultural Resources*, 32 U.Miami L.Rev. 291, 298–99 (1978), *citing United States v. Tyndale*, 116 F. 820, 823 (1st Cir. 1902); *Murphy v. Dunham*, 38 F. 503, 509–10 (E.D.Mich.1889); *Russell v. Forty Bales of Cotton*, 21 F.Cas. 42, 48–50 (S.D.Fla.1872) (No. 12, 154); *Thompson v. United States*, 62 Ct.Cl. 516, 524 (1926). In *Treasure Salvors, Inc. v. The*

---

24. The state's title to abandoned marine property as an inherent prerogative of its sovereignty has been recognized in only three American cases: *Platoro Ltd., Inc. v. Unidentified Remains of a Vessel*, 371 F.Supp. 356 (S.D.Tex. 1973), *rev'd on other grounds*, 508 F.2d 1113 (5th Cir. 1975); *State ex rel. Bruton v. Flying "W" Enterprises, Inc.*, 273 N.C. 399, 160 S.E.2d 482 (1968); and *State By and Through Ervin v.*

*Massachusetts Co.*, 95 So.2d 902 (Fla.1957). All three have been roundly criticized in academic literature. *See* Kenny & Hornsoff, *The Ownership of the Treasures of the Sea*, 9 Wm. & Mary L.Rev. 383 (1967–68); Note, *Abandoned Property: Title to Treasure Recovered In Florida's Territorial Waters*, 21 U.Fla.L.Rev. 360 (1969).

214

*Unidentified Wrecked and Abandoned Sailing Vessel*, 569 F.2d 330 (5th Cir.1978) (*Treasure Salvors I*), the Fifth Circuit, in considering the United States' asserted ownership of an abandoned and wrecked sailing vessel located on the Continental Shelf, held that the United States had not made the required statutory claim. It found that neither the Antiquities Act, 16 U.S.C. §§ 431–433, the Abandoned Property Act, 40 U.S.C. § 310, nor the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356 manifested an intent by the sovereign to claim ownership of such ancient abandoned sailing vessels. Now, with respect to the remains of a vessel admittedly within Florida's territorial waters, the State seeks to fill the perceived gap by asserting that it owns and has plenary authority to administer abandoned property lying on the lands underlying the ocean within its territorial boundaries. In so doing, the State claims that its statute supercedes the plaintiff's federal right to a salvage award.

 There are certain areas of concurrent maritime state and federal jurisdiction in which the state is free to assume authority in a manner not inconsistent with federal rules. The protection of natural resources for environmental or health and food purposes is one such area of mutual concern. In *Manchester v. Commonwealth of Massachusetts*, 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159 (1891), for example, the Supreme Court held that a challenged fishing regulation was within the state's power to enact, stating:

[In *Smith v. Maryland*, 18 How. 71, 74 [59 U.S. 71, 15 L.Ed. 269] Mr. Justice Curtis, on the question of admiralty jurisdiction, said:] "[W]e consider it to have been settled by this Court in *U. S. v. Bevans*, 3 Wheat. 336 [16 U.S. 336, 4 L.Ed. 404] that [the Admiralty Clause] did not affect the jurisdiction nor the legislative power of the states over so much of their territory as lies below highwater mark, save that they parted with the power so to legislate as to conflict with admiralty jurisdiction or the laws of the United States."

139 U.S. at 261, 11 S.Ct. at 563 (emphasis added). In *Manchester*, the Court, recognizing that there was no extant body of federal law regarding the regulation of fisheries, concluded that the right to control "exist[ed] in the state in the absence of the affirmative action of Congress taking such control," 139 U.S. at 266, 11 S.Ct. at 565; thus, the state courts were competent to enforce such right.

In salvage cases, however, at least one Florida court has denied that the state courts have concurrent jurisdiction. The District Court of Appeal, Third District, stated that "*[s]alvage being a matter peculiarly within the jurisdiction of the admiralty courts* because, inter alia, of the peculiar system awarding the compensation, we hold that the trial court correctly dismissed the instant salvage action." *O'Neill v. Schoenbrod*, 355 So.2d 440 (Fla.3d DCA 1978) (emphasis added). Further, there are substantial federal rights which the operation of Florida's statute would impede. The State, therefore, cannot rely upon the concurrent jurisdiction concept in support of its position.

The State's reliance, in part, on the operation of the Submerged Lands Act to support its asserted right to govern salvage operation off its coast to the exclusion of federal law is similarly ill-founded. The Submerged Lands Act of 1953 "grant[ed] to the State 'title to and ownership of the lands beneath navigable waters within the boundaries of the respective States.'" *United States v. California*, 381 U.S. 139, 145–146, 85 S.Ct. 1401, 1405, 14 L.Ed.2d 296 (1965). The Supreme Court, in assessing the Act shortly after its passage, commented:

[T]he Act effectively grants each State on the Pacific Coast all submerged land shoreward of a line three geographical miles from its "coast line", derivatively defined in terms of "the seaward limit in inland waters." "Inland waters" is not defined by the Act.

In a later measure related to the Submerged Lands Act, Congress declared that the United States owned all sub-

merged land in the continental shelf seaward of the lands granted to the States. Outer Continental Shelf Lands Act, 67 Stat. 462, 43 U.S.C. § 1331 et seq. 381 U.S. at 148, 85 S.Ct. at 1407.

Through the Submerged Lands Act, Congress sought to "undo the effect of [the Supreme Court's] decision in *United States v. California*, 332 U.S. 19 [, 67 S.Ct. 1658, 91 L.Ed. 1889] . . . ." 381 U.S. at 146, 85 S.Ct. at 1405. In that case, the Court had addressed the then pressing question of "whether the state or Federal Government had the paramount right and power to determine in the first instance when, how, and by what agencies, foreign or domestic, the oil and other resources of the soil of the marginal sea, known or hereafter discovered may be exploited." In the first *California* opinion, the Court had concluded that "the Federal Government rather than the state has paramount rights in and power over that belt, an incident to which is full dominion over the resources of the soil under the water area, including oil." More specifically, the Court, while conceding that the state had been "authorized to exercise local police power functions in the part of the marginal belt within its declared boundaries," held that:

> The United States of America is now, and has been at all times pertinent hereto, possessed of paramount rights in, and full dominion and power over, the lands, minerals and other things underlying the Pacific Ocean lying seaward of the ordinary low-water mark on the coast of California, and outside of the inland waters, extending seaward three nautical miles * * *. The State of California has no title thereto or property interest therein.

*United States v. California*, 332 U.S. 804, 805, 68 S.Ct. 20, 21, 92 L.Ed. 382 (1947).

The "paramount rights" of the federal government, however, were thereafter ceded to the states through the Submerged Lands Act of 1953. *See United States v. California*, 436 U.S. 32, 98 S.Ct. 1662, 56 L.Ed.2d 94 (1978). But the nature of the question posed first to the Court and later to Congress strongly suggests that neither ensuing pronouncement contemplated an ouster of federal maritime jurisdiction over and application of federal principles to traditional salvage claims. Rather, it is apparent that the disposition of natural resources in the submerged land of the three-mile tidal belt—and hence, the right to determine who could enter into leases regarding oil well activity—was the subject of both the Court's decree and the legislature's subsequent enactment.

This interpretation is supported by the Fifth Circuit's recent analysis of the United States' "paramount rights" in the Outer Continental Shelf lands. "In the Outer Continental Shelf Lands Act, 'Congress emphatically implemented its view that the United States has paramount rights to the seabed beyond the three-mile limit.' [*United States v. Maine*, 420 U.S. 515, 526 [95 S.Ct. 1155, 1161, 43 L.Ed.2d 363] (1975)]." *Treasure Salvors I*, 569 F.2d 330, 338 (5th Cir. 1978). As stated earlier, the Supreme Court viewed the Continental Shelf Lands Act, companion to the Submerged Lands Act, as a declaration of the United States' ownership of "all submerged land in the continental shelf seaward of the lands granted to the States." The Fifth Circuit, cognizant of the historical backdrop to the Continental Shelf Lands Act, has interpreted that the United States' ownership interest, or "paramount rights," pertains only to natural resources, and *not* to historic wreck sites, discovered on continental shelf land. *See Treasure Salvors I*, 569 F.2d at 338–40.

■ Now the sovereign State of Florida, by statute, claims plenary authority over the sunken artifacts, derivatively through the Submerged Lands Act. This Court agrees with the Fifth Circuit's parallel analysis, however, that "a limited construction of the Act comports with the primary purpose of resolving competing claims to ownership of the natural resources of the offshore seabed and subsoil." 569 F.2d at 339. Accordingly, this Court concludes that the Submerged Lands Act does not empower the State, through legislation which purports to derogate both federal jurisdiction and the application of admiralty principles,

to lay claim to abandoned wreck sites within the three-mile limit recognized under that Act.

However, just as the Supreme Court has recognized the Federal Government's express retention of certain interests in submerged lands not premised on the "paramount rights" acknowledged in the first *California* opinion, this Court recognizes the State's articulated interest in ancient artifacts found within her territorial waters—an interest not grounded in the "paramount rights" acquired under the Submerged Lands Act. It arises, rather, out of recognition that Florida, as trustee for her citizens of the cultural heritage of their state, maintains an interest in all finds of historical significance within her territory. While this interest may not serve to abrogate either the operation of federal jurisdiction or the application of traditional admiralty principles in the disposition of maritime salvage claims, neither is that interest vitiated where historically significant artifacts are discovered on an ocean, rather than a terrestrial, site.

In summary, then, while the matter of a fitting salvage award to the salvors here involved remains for disposition at trial, this Court concludes that the plaintiff has satisfied its burden of proof regarding likelihood of success on the merits. The interest recognized on behalf of the State is not one which would bar a proper salvage award for the plaintiff's services in restoring to the mainstream of commerce and culture these historically invaluable goods left abandoned to the sea.

While a portion of the artifacts recovered by the plaintiff would be set aside for the State for purposes of display [25], and while the State's interest warrants the participation of her agents in safeguarding the preservation of artifacts and collection of archeological data, because the remainder would be awarded to the successful salvor, the Court finds and concludes that Cobb Coin, Inc. has demonstrated a likelihood of success on the merits.

**B.** *The Movant, Cobb Coin, Will Suffer Irreparable Injury Unless An Injunction Issues*

█ The second element which the movant must demonstrate is that it will suffer irreparable injury in the absence of the requested injunction. The evidence presented at the eleven-day hearing manifestly demonstrates the irreparable harm Cobb Coin and its agents will suffer if Florida is not enjoined from enforcing its statute. The State's insistence on enforcing its Archives and History Act by arresting Fisher's men at the Corrigan Site despite the pendency of this Federal Court proceeding injures Cobb Coin.by coercing its employees to desist from the salvage operations which are being conducted under the auspices of this Court. Because of that harassment, the plaintiff's salvors are being deterred from salving. Such a denial of opportunity may result in many objects never being recovered; that damage constitutes classic irreparable injury, both to the plaintiff and to the public welfare.

As is detailed above in the procedural history of the case, the State's agents have repeatedly attempted to execute the criminal processes of the State against Cobb Coin and its agents and employees. Since this Court's July 7th temporary restraining order, the parties have presented evidence at a hearing on the plaintiff's motion for a preliminary and permanent injunction. At the Miami Courthouse, on August 4, 1981 (the fifth full day of hearings on the motion), the plaintiff's counsel notified the Court that a warrant had been issued for the arrest of two of the plaintiff's employees. This Court, cognizant that criminal prosecution is a matter within the prerogative of the State's executive branch, and determined, if possible, to avoid a confrontation between the State and Federal legal systems, asked counsel for the State to see whether the Attorney General would voluntarily desist in pursuing the plaintiff's agents during this Court's disposition of the injunction motion. The Court recessed for

---

**25.** *See* Section II.A.1.b., *supra*.

three hours to allow the State's counsel to make the necessary phone calls. After lunch, counsel for the State told the Court that he had informed the responsible executive authority of the Court's wishes, but that the State's officers continued to assert the supremacy of its statutory scheme despite the ongoing litigation in this Court, and that they intended to pursue the criminal prosecution notwithstanding the pending Federal Court proceeding. The evidence showed that at least two of Cobb Coin's divers engaged in working the Corrigan Site were intentionally staying out of St. Lucie County to avoid being served with arrest warrants. They, and all the plaintiff's salvors, are not working the site in order to avoid being arrested. For that reason, the plaintiff, during the course of the hearing, renewed its motion for an Order to Show Cause why the State's agents should not be held in contempt.

It is obvious that the constant attempts by the county sheriff, his deputies, and the Marine Patrol officers to prosecute the plaintiff's agents for, and thereby prevent them from, active salvage efforts, are a source of irreparable injury. The attempt to enforce the State's criminal law in interference with this Court's exercise of its jurisdiction would, in itself, be sufficient injury to warrant the requested injunction. By preventing Cobb Coin from salving under the express permission of this Court, the State's agents impose on the plaintiff still further irreparable injury. As detailed in the Order of 7 July 1981, Cobb Coin is forced, during the period of deferment, to pay for, yet forego, the use of highly specialized and expensive salvage vessels and crew people. Further, Cobb Coin may, in its absence, lose control of the site to other salvors who, without this Court's supervision, could conduct salvage operations indiscriminately.

Finally, and perhaps most importantly, if the injunction does not issue, the plaintiff must forego absolutely irretrievable and uncompensable time that it would otherwise spend salving the wreck site. Every day lost in the salving effort means fewer artifacts recovered for the benefit of socie-

ty. Moreover, any of the natural phenomena that befell these ill-starred galleons over the past two hundred sixty-six years could yet move their cargo some yards in any direction, or deeper under the sand. At any moment, the value of all of the plaintiff's monumental discovery and charting efforts could be destroyed by one of the dozens of tropical storms or hurricanes that undoubtedly will churn the warm Atlantic waters off Florida's coast between June and October, and the loss of that information would irreparably harm not only the plaintiff, but all parties interested in recapturing and preserving the historic treasures of the 1715 fleet. Clearly, the movant will be irreparably harmed if the injunction does not issue.

C. *The Threatened Injury To The Movant Outweighs Whatever Damage The Injunction May Cause The Parties Opposed*

■■■ If the proposed injunction does not issue, the injury to the movant Cobb Coin would far outweigh any damage that might accrue to either the State or Quest Corporation. In fact, as shown above, the denial of the injunction would greatly injure the movant, while the issuance of the injunction simply would not materially damage either the State or Quest.

The State's basic reason for opposing the injunction lies in the contention that its laws, rather than the federal maritime law, should govern the salvage of the Corrigan Wreck Site. For the past twenty years, the Division of Archives and Records Management has licensed salvors and parcelled out rights to explore the ocean within its boundaries. The damage to be incurred by the State should the injunction issue would be the loss by the Division of its authority to implement the State's licensing program. Yet, as noted in Section III.A.1.c., each of the interests which the Division purports to serve will be at least as well—if not better—served through application of federal maritime law, in which salvage operations and awards are overseen by the admiralty court.

First and foremost, the goal of retrieving and preserving historical and archeological artifacts can best be achieved if items are successfully salved. Cobb Coin has been remarkably successful in retrieving such items in the two years it has worked the site, as indicated by the extensive inventory [26] compiled by the court-appointed custodian Arthur Hartman and introduced in evidence. In 1980 and 1981, Cobb Coin retrieved over 1,000 silver coins, 14 gold pieces, including 8 Royal escudos, silver containers, bronze forks, magnificent timbers complete with dead eyes, and hundreds of other historic items.

As mentioned above, this Court intends to award an appropriate portion of the artifacts to the State as custodian for the people. Thus, the injunction and relief fashioned by this Court will clearly be consistent with Florida's avowed purpose to "[l]ocate, acquire, protect, preserve, and promote the location, acquisition, and preservation of historic sites, . . . artifacts, treasure trove and objects of antiquity . . . ." F.S. § 267.061(2)(a).

Implicit in the State's interest in acquisition and preservation is that the removal of artifacts be accomplished with scrupulous care. The historic value of each artifact is enhanced by careful monitoring of archeological provenience, the exact location at which each item is found in terms of coordinates on the ocean, the depth under the water, the extent buried beneath the ocean bottom, and the geographical relationship to other items found. This information is not only important for the historical information it provides, but was shown at the hearing to be essential to the intrinsic value of salved items for purposes of resale to interested buyers. If salvage on an ancient shipwreck is conducted without proper regard for this essential information, both the historic and market value of the artifacts are substantially diminished.

At the hearing, Cobb Coin's salvage consultants, Fay Feild and R. Duncan Mathewson, testified regarding the techniques Mel Fisher's crews use in monitoring the archeological provenience of salvage sites. According to their testimony, it is in the salvor's best interest to record all such data accurately, both to enhance the historical value of a piece and to enhance an artifact's value for purposes of sale. The plaintiff demonstrated to the Court's satisfaction that it adequately documents archeological provenience in its salvage operations on the Corrigan Site. Because of Cobb Coin's accurate record keeping, the State's interest in acquiring and preserving historic and archeological information will be fully served if the injunction issues.

This Court concludes that none of the State's asserted interests will be jeopardized by the granting of the requested injunction. In addition to the benefits to be gained from the plaintiff's salvage acumen and care in excavating, there is no question that Cobb Coin has consistently turned over the artifacts it finds to the Court's custody. There has been no evidence that Cobb Coin is a dishonest salvor. Further, pursuant to this Court's order of 12 October 1979, a State agent has been aboard the plaintiff's salvage vessel, observing the recovery from the wreck site and cataloguing and authenticating articles as they are brought up in order to ensure that the State's interest is fully protected. That Order will be renewed in the Order Granting Preliminary Injunction which follows this memorandum opinion.

Not only will the objects be turned over to the custody of the Court, they will be well preserved for the benefit of the scientific, cultural, and perhaps buying, public. The evidence at the hearing demonstrated that many metals kept underwater for such long periods of time as these corrode and disintegrate within a matter of hours if not properly treated, once they are brought out

26. In contrast, the State's licensee, Quest Corporation, was notably unproductive in the period it exercised exclusive "control" of the site by virtue of its lease. Whether lack of diligent effort or lack of competence was the cause of

Quest's low rate of retrieval need not now be determined. For purposes of the injunction, what is material is Cobb Coin's unquestioned success and thereby its contribution to the recognized interests of the State.

of the sea. Both the State and plaintiff, however, have qualified facilities to protect the artifacts, according to uncontroverted testimony by witnesses for each side. Further, during the pendency of the injunction, the artifacts will be taken care of by this Court's custodian, and no injury will inure to the State thereby.

In short, the only interest of the State which the injunction would disrupt is its autonomy in enforcing its statutory licensing scheme. But as detailed above, that scheme cannot be given effect by this Court to the extent that it is inconsistent with federal admiralty principles. Moreover, all the important substantive interests which the State asserts—the location, acquisition, and preservation of historic and archeological treasures—will be effectuated by the relief this Court intends to fashion. Therefore, the balance of harm in this case would clearly fall upon the plaintiff if the injunction does not issue.

The other party arguably affected by an injunction is the State's licensee, Quest Corporation. At final argument, Quest claimed that it has been "ousted" from possession of the wrecksite by the plaintiff's lawsuit and this Court's orders. Actually, any such ouster is a figment of Quest's imagination. No Court order has required that Quest refrain from searching or salving on the Corrigan Site; any decision not to work the site was Quest's. Quest only actively attempted salvage on the Corrigan Site for a total of forty-nine (49) days prior to the time Cobb Coin filed this suit, and whether it has the further right to operate thereon will be a question to be resolved in the final order. In any event, the injunction will impose no hardship on Quest at all, much less any harm that would warrant denying the injunction motion.

D. *The Injunction Would Not be Adverse to the Public Interest*

The granting of this injunction would clearly not be adverse to the public interest; rather, its ultimate effect will inure to the public's benefit. The public interest, as perceived by the Court, lies both in the maximum acquisition of items from the wrecked cargo, and in the exercise of utmost scientific integrity in the salvage and preservation process. As indicated in the above discussion of the balance of injury, the plaintiff's continued salving of the Corrigan Site will best effectuate both aspects of the public interest.

In fact, should the injunction not issue, the public interest would be disserved. This Court finds the actions of the agents and employees of the State of Florida to be not only unproductive, but in the nature of undue harassment and an impediment to the Court's exercise of its admiralty jurisdiction. The plaintiff shall therefore be permitted to continue its operations without the interference heretofore caused by the State's officers, agents, and employees, until further order of this Court.

In conclusion, this Court holds that the movant, Cobb Coin, has carried its burden of showing the four factors necessary for the granting of an injunction. It has shown a likelihood that it will prevail on the merits of its claim for a salvage award. Florida's Archives and History Act, chapter 267, Florida Statutes (1979), may not be enforced in derogation of the rights of a salvor who invokes the federal admiralty court's jurisdiction seeking a salvage award. This ruling does not affect the validity of the Florida statute to the extent it prevents people from stealing from archeological sites historic artifacts in which the State has a legitimate interest. This Order does not extend to situations where there is no conflict with any maritime right, as, for example, in this case of state-owned upland sites, or where admiralty jurisdiction has not been invoked. This Court holds simply that the statute cannot supercede the federal rights of one to search the navigable waters, find and salvage abandoned or derelict property, and bring any items thus recovered into the admiralty court for a determination of that person's rights in the property. Should any person so invoke the admiralty's court jurisdiction, the court will adjudge that party's rights as a finder or salvor as against any competing claimant,

determine whether his efforts satisfy admiralty's diligence requirements, and declare the rights of the respective parties.

This Court further holds that the movant Cobb Coin will be irreparably harmed if the injunction does not issue, because its employees are being harassed by threatened criminal prosecution, and because it will suffer enormous monetary and opportunity costs if it is prevented from working the Corrigan Site. The State and its licensee, Quest, will not be injured at all by an injunction. The interest of the State in preserving a share of the artifacts recovered will be protected by the final award of this Court.

Finally, the public interest in acquiring and preserving historic and archeological treasures will best be effectuated by permitting the plaintiff to continue its successful discoveries at the site.

Wherefore, it is ORDERED, ADJUDGED and DECREED as follows:

1. The plaintiff's motion for a preliminary injunction is hereby granted. The agents, employees, and attorneys of the State of Florida, including but not limited to any county sheriff or deputy, or Florida Marine Patrol Officer, are specifically enjoined from interfering with the plaintiff's ongoing salvage operations or arresting the plaintiff's officers, agents and employees. The $500.00 bond heretofore posted by the plaintiff will stand as security for this injunction as required by Fed.R.Civ.P. 65(c). The Court hereby reaffirms its prior Order of October 12, 1979, expressly permitting the State to maintain an inspection agent aboard the vessel for the purpose of cataloguing and authenticating recovered artifacts.

2. The plaintiff's motion for issuance of a rule to show cause why the State's agents, employees, and attorneys should not be held in contempt is denied without prejudice to the plaintiff's right to reassert it in the event the State's agents, employees, or attorneys disobey this Order or attempt to interfere with the admiralty jurisdiction of the United States District Court.

## APPENDIX A

### PERTINENT PROVISIONS OF THE FLORIDA ARCHIVES AND HISTORY ACT

### CHAPTER 267

**267.031 Division of archives, history and records management**

(1) The division of archives, history and records management shall be organized into as many bureaus as deemed necessary by the division for the proper discharge of its duties and responsibilities under this chapter; provided, however, that in addition to the office of the director, there shall be at least four bureaus to be named as follows:

(a) Archives and records management;

(b) Historic sites and properties;

(c) Historical museums;

(d) Publications.

(2)(a) The secretary of state is hereby authorized to appoint advisory councils to provide professional and technical assistance to the division. The councils shall consist of not less than five nor more than nine members, and such appointments shall consist of persons who are qualified by training and experience and possessed of proven interest in the specific area of responsibility and endeavor involved.

(b) The chairman of each of said councils shall be elected by a majority of the members of the council and shall serve for two years. If a vacancy occurs in the office of chairman before the expiration of his term, a chairman shall be elected by a majority of the members of the council to serve the unexpired term of such vacated office.

(c) It shall be the duty of any of the advisory councils appointed hereunder to provide professional and technical assistance to the division as to all matters pertaining to the duties and responsibilities of the division in the administration of the provisions of this chapter. Members of the councils shall serve without pay, but shall be entitled to reimbursement for their necessary travel expenses incurred in carrying out their official duties, as provided by § 112.061.

(3) The division may employ a director of the division and shall establish his qualifications. The director shall act as the agent of the division in coordinating, directing, and administering the activities and responsibilities of the division. The director may also serve as the chief of any of the bureaus herein created. The division may employ other employees as deemed necessary for the performance of its duties under this chapter.

(4) The division shall adopt such rules and regulations deemed necessary to carry out its duties and responsibilities under this chapter, which rules shall be binding on all agencies and persons affected thereby. The willful violation of any of the rules and regulations adopted by the division shall constitute a misdemeanor.

(5) The division may make and enter into all contracts and agreements with other agencies, organizations, associations, corporations and individuals, or federal agencies as it may determine are necessary, expedient, or incidental to the performance of its duties or the execution of its powers under this chapter.

(6) The division may accept gifts, grants, bequests, loans, and endowments for purposes not inconsistent with its responsibilities under this chapter.

(7) All law enforcement agencies and offices are hereby authorized and directed to assist the division in carrying out its duties under this chapter.

## 267.061 Bureau of historic sites and properties; state policy, responsibilities

(1) State policy relative to historic sites and properties:

(a) It is hereby declared to be the public policy of the state to protect and preserve historic sites and properties, buildings, artifacts, treasure trove, and objects of antiquity which have scientific or historical value or are of interest to the public, including, but not limited to monuments, memorials, fossil deposits, Indian habitations, ceremonial sites, abandoned settlements, caves, sunken or abandoned ships, historical sites and properties and buildings or objects, or any part thereof relating to the history, government and culture of the state.

(b) It is further declared to be the public policy of the state that all treasure trove, artifacts and such objects having intrinsic or historical and archaeological value which have been abandoned on state-owned lands or state-owned sovereignty submerged lands shall belong to the state with the title thereto vested in the division of archives, history and records management of the department of state for the purpose of administration and protection.

(2) It shall be the responsibility of the bureau of historic sites and properties to:

(a) Locate, acquire, protect, preserve, and promote the location, acquisition, and preservation of historic sites and properties, buildings, artifacts, treasure trove, and objects of antiquity which have scientific or historical value or are of interest to the public, including, but not limited to monuments, memorials, fossil deposits, Indian habitations, ceremonial sites, abandoned settlements, caves, sunken or abandoned ships, or any part thereof;

(b) Develop a comprehensive statewide historic preservation plan;

(c) Encourage and promote the acquisition, preservation, restoration and operation of historic sites and properties by other agencies so that such property may be utilized to foster and promote appreciation of Florida history; provided, however, that no acquisition, preservation, restoration, or operation of such sites shall be made by the state and no contribution shall be paid from state funds for such purposes until:

1. A report and recommendation of the advisory council has been received and considered by the division;

2. The division has determined that there exists historical authenticity and a feasible means of providing for the acquisition, preservation, restoration, or operation of such property;

3. The property shall have been approved for such purpose by the division;

(d) Cooperate and coordinate with the division of recreation and parks of the depart-

ment of natural resources in the operation and management of historic sites and properties subject to the division of archives, history and records management.

(3) The division shall employ a state archaeologist, and such other archaeologists as deemed necessary, who shall possess such qualifications as the division may prescribe. The state archaeologist shall be assigned to the bureau of historic sites and properties and shall serve at the pleasure of the division. The state archaeologist, with emphasis on salvage archaeology, shall conduct an archaeological survey of the state and shall perform such other duties as the chief of the bureau of historic sites and properties may prescribe.

(4) The division may employ a chief of the bureau of historic sites and properties. The chief shall possess such qualifications as the division may prescribe but shall be qualified by experience and training to administer the functions of the bureau and he shall serve at the pleasure of the division. It shall be the duty of the chief, under the general administration of the director, to supervise, direct, and coordinate the activities of the bureau of historic sites and properties.

## 267.10 Legislative intent

In enacting this law, the legislature is cognizant of the fact that there may be instances where an agency may be microfilming and destroying public records or performing other records management programs, pursuant to local or special acts; the legislature is further aware that it may not be possible to implement this chapter in its entirety immediately upon its enactment and it is not the legislative intent by this chapter to disrupt the orderly microfilming and destruction of public records pursuant to such local or special acts above referred to; provided, however, that such agencies make no further disposition of public records without approval of the division of archives, history and records management of the department of state pursuant to such rules and regulations as it may establish.

## 267.11 Designating archaeological sites

The division of archives, history, and records management may publicly designate an archaeological site of significance to the scientific study or public representation of the state's historical, prehistorical, or aboriginal past as a "state archaeological landmark." In addition, the division may publicly designate an interrelated grouping of significant archaeological sites as a "state archaeological landmark zone." However, no site or grouping of sites shall be so designated without the express written consent of the private owner thereof. Upon designation of an archaeological site, the owners and occupants of each designated state archaeological landmark or landmark zone shall be given written notification of such designation by the division. Once so designated, no person may conduct field investigation activities without first securing a permit from the division.

## 267.12 Research permits; procedure

(1) The division may issue permits for excavation and surface reconnaissance on state lands or lands within the boundaries of designated state archaeological landmarks or landmark zones to institutions which the division shall deem to be properly qualified to conduct such activity, subject to such rules and regulations as the division may prescribe, provided such activity is undertaken by reputable museums, universities, colleges, or other historical, scientific, or educational institutions or societies that possess or will secure the archaeological expertise for the performance of systematic archaeological field research, comprehensive analysis, and interpretation in the form of publishable reports and monographs, such reports to be submitted to the division.

(2) Those state institutions considered by the division permanently to possess the required archaeological expertise to conduct the archaeological activities allowed under the provisions of the permit may be designated as accredited institutions which will be allowed to conduct archaeological field activities on state-owned or controlled lands or within the boundaries of any designated state archaeological landmark or landmark zone without obtaining an individual permit for each project, except that those accredited institutions will be required to give prior written notice of all anticipated archaeological field activities on state-owned or con-

trolled lands or within the boundaries of any designated state archaeological landmark or landmark zone to the division, together with such information as may reasonably be required by the division to insure the proper preservation, protection, and excavation of the archaeological resources. However, no archaeological activity may be commenced by the accredited institution until the division has determined that the planned project will be in conformity with the guidelines, regulations, and criteria adopted pursuant to §§ 267.11–267.14. Such determination will be made by the division and notification to the institution given within a period of fifteen days from the time of receipt of the prior notification by the division.

(3) All specimens collected under a permit issued by the division or under the procedures adopted for accredited institutions shall belong to the state with the title thereto vested in the division of archives, history, and records management of the department of state for the purpose of administration and protection. The division may arrange for the disposition of the specimens so collected by accredited state institutions at those institutions and for the temporary or permanent loan of such specimens at permit-holding institutions for the purpose of further scientific study, interpretative displays, and curatorial responsibilities.

### 267.13 Prohibited practices; penalties

(1) Any person who shall conduct field investigations on any land owned or controlled by the state or its departments or institutions or within the boundaries of any designated state archaeological landmark or landmark zone without first obtaining a permit or having first received from the division a notice to proceed under the procedures relating to accredited institutions, or any person who shall appropriate, deface, destroy, or otherwise alter any archaeological site or specimen located upon state lands or within the boundaries of a designated state archaeological landmark or landmark zone, except in the course of activities pursued under the authority of a permit or under procedures relating to accredited in-

stitutions granted by the division, shall be guilty of a misdemeanor punishable by a fine not exceeding $500 or by imprisonment in the county jail for a period not to exceed 6 months or both, and in addition, shall forfeit to the state all specimens, objects, and materials collected or excavated, together with all photographs and records relating to such material.

(2) Any person who shall reproduce, retouch, rework, or forge any archaeological or historical object originating from an archaeological site as designated by §§ 267.-11–267.14, and deriving its principal value from its antiquity, or make any such object, whether copies or not, or falsely label, describe, identify, or offer for sale or exchange any object, with intent to represent the same to be an original and genuine archaeological or historical specimen, or any person who shall offer for sale or exchange any object with knowledge that it has previously been collected or excavated in violation of any of the terms of §§ 267.11–267.14 shall be guilty of a misdemeanor punishable by a fine not exceeding $500 or by imprisonment in the county jail for a period not to exceed 6 months or both.

### 267.14 Legislative intent

It is the declared intention of the legislature that field investigation activities on privately owned lands should be discouraged except in accordance with both the provisions and spirit of §§ 267.11–267.14; and persons having knowledge of the location of archaeological sites are encouraged to communicate such information to the division of archives, history, and records management.

### APPENDIX B

### RULES OF THE DEPARTMENT OF STATE
### DIVISION OF ARCHIVES, HISTORY AND RECORDS MANAGEMENT
### HISTORIC SITES AND PROPERTIES
### CHAPTER 1A–31

### PROCEDURES FOR ACQUIRING AND PROTECTING ANTIQUITIES ON STATE LANDS

1A–31.01 Definition

1A–31.02 Scope of law
1A–31.03 Board authorized to enter into contracts
1A–31.04 Declaration of ownership by state
1A–31.05 Contracts for exploration
1A–31.06 Contract for salvage
1A–31.07 Interpretation of contracts
1A–31.08 Employment contracts
1A–31.09 Ownership and payment for recovery
1A–31.10 Supervision
1A–31.11 Boats to carry identification
1A–31.12 Penalty; unauthorized exploration and salvage.

1A–31.01 Definition.

Specific Authority 267.031(5) FS. Law Implemented 267.061 FS. History—New 5–7–68, Repealed 1–1–75.

1A–31.02 Scope of law. Section 267.061, Florida Statutes, 1967 shall apply to all abandoned articles of ancient, historic or intrinsic value, recovered on or beneath lands, where title is vested in State of Florida or any state agency, and all state-owned sovereignty submerged lands. Any unauthorized recovery of these articles from said lands shall be punishable, upon conviction, as provided in Section 267.031(5), Florida Statutes, 1967.

Specific Authority 267.031(4) FS. Law Implemented 267.061 FS. History—New 5–7–68, Repromulgated 1–1–75.

1A–31.03 Division authorized to enter into contracts.

(1) The Division acting through the Director is authorized to enter into contracts for exploration and contracts for salvage of given areas of state-owned submerged lands for treasure trove, including precious metals and jewelry, antique articles and artifacts and other similar objects of historical and archaeological value, and such contract, nor any part thereof shall not be assigned nor sublet. Neither exploration or salvage operations shall be conducted on state-owned lands without having first contracted with the Division.

(2) Contracts for exploration. The Division is Authorized to enter into a contract for exploration of submerged sovereignty lands only after a determination that the person or corporation seeking such contract is willing and professionally able to carry out said contract and gives evidence of sufficient financial ability to carry on exploration for antiquities, treasure trove or related materials so as to accurately determine the presence or absence of valuable material in the areas covered by said contract.

(3) The contractor shall, at his own expense, commission a bonded oceanographic surveyor to locate with semipermanent markers or buoys all corners of an exploration area, or center of a salvage site, before any work is performed in the contract area. The contractor will be responsible for the maintenance of these buoys and insure that the contract number is displayed on each one.

(4) Prop-wash excavating devices shall be used only for defining the limits of the archaeological site or for the removal of non-cultural overburden. Any further use of such devices shall be done only with the specific approval from the Division. The State representative on board may, at his discretion, halt the use of approved prop-wash excavating devices until there is an opportunity to receive the opinion of the Division concerning potential site destruction from such use. Any excavation on archaeological materials shall be done by airlift, injection dredge, or other similar devices of a size and type approved by the Division.

On the date the contract is delivered, the delivery agent shall inspect all excavating devices. The contractor shall adequately demonstrate, to the satisfaction of the delivery agent, that appropriate safety precautions will be in effect during the operation of these devices.

(5) If a contract is granted, the contractor shall complete substantially all contractual requirements. This shall include preparation of accurate charts of the entire contract area and a magnetometer chart or map plotted to a scale acceptable to the Division showing the entire contract area

and all magnetic anomalies and other cultural features encountered. This chart shall also show water depth, buoys, landmarks, and existing shipwrecks. The chart shall include descriptions of all anomalies investigated or examined. In the event that work being performed under a salvage contract is terminated without agreement of the Division, the contractor shall forfeit any and all claims to material recovered under the terms of the contract.

(6) The trustees of the Internal Improvement Trust Fund shall be notified by the Division of all new contracts at the time a contract is issued.

Specific Authority 267.031(4) FS. Law Implemented 267.031(5) FS. History—New 5–7–68, Revised 1–1–75.

1A–31.04 Declaration of ownership by state.

Specific Authority 267.031(5) FS. Law Implemented 267.061 FS. History—New 5–7–68, Repealed 1–1–75.

1A–31.05 Contracts for exploration.

Specific Authority 267.031(5) FS. Law Implemented 267.061 FS. History—New 5–7–68, Repealed 1–1–75.

1A–31.06 Contract for salvage.

Specific Authority 267.031(5) FS. Law Implemented 267.061 FS. History—New 5–7–68, Repealed 1–1–75.

1A–31.07 Interpretation of contracts. It is the intention of the Division to limit contracts for exploration or salvage of treasure trove insofar as this is practicable to those persons or corporations who will themselves conduct the exploration or salvage, and who will remain solely answerable to the Division for the conduct of its operations and the proper accounting of materials located and recovered under the terms of the contract.

Specific Authority 267.031(4) FS. Law Implemented 267.061 FS. History—New 5–7–68, Repromulgated 1–1–75.

1A–31.08 Employment contracts. Employment contract is defined for the purpose of this act as being a contract between the principal party to a contract for exploration or salvage, and others who purport to be supplied and equipped to do the actual exploration and salvaging for the principal to the contract. Such contracts, the language of which shall be approved by the counsel for the Division, are authorized to enter into provided prior written approval of the Division shall have been obtained. The Division will not approve such employment contracts, and will consider any contract for exploration or salvage as subject to cancellation if the principal party thereto does not retain primary responsibility for the actual exploration and salvage operations.

Specific Authority 267.031(4) FS. Law Implemented 267.031(5) FS. History—New 5–7–68, Amended 1–1–75.

1A–31.09 Ownership and Payment for recovery. Any and all treasure trove, artifacts and other similar valuable historical material recovered in the waters of the State of Florida belong to the State of Florida, and payment for the recovery of such material shall be made in accordance with the contracts entered into by the Division. All recovered artifacts shall be retained in such a place and manner as approved by the Division. At the time of the payment for recovery by those having contracts for salvage with the Division there shall be present such agent or agents of the Division as the Division shall deem necessary and appropriate.

Specific Authority 267.031(4) FS. Law Implemented 267.061(1)(b), 267.061(2)(a) FS. History—New 5–7–68, Amended 1–1–75, 9–6–78.

1A–31.10 Supervision.

(1) To afford adequate protection for the interest of the State it is the established policy of the Division to limit the number of contracts for exploration and contracts for salvage to be granted to those that can be properly supervised and administered by the duly authorized agents of the Division.

(2) A designated agent of the Division shall be present, as required by the Division, for all such operations by holders of contracts for exploration.

(3) No contract for salvage shall be entered into by the Division unless two (2)

agents of the Division are available to be assigned to oversee salvage operations thereunder; provided however, if only one agent is available the salvage contractor shall furnish the other; provided, further, this person shall be assigned specifically to, and work under the supervision of, the Division's agent, and must meet the State's current employment qualifications for a field agent. Notwithstanding the stipulation herein that two (2) agents be present in the case of salvage operations, the Division may, at its discretion, require only one agent be present in instances where deemed appropriate.

(4) Prior to commencing work and subject to weather conditions or equipment failure, a two (2) week itinerary shall be submitted in advance, by each contractor. This itinerary shall include anticipated work schedule, area of contract to be worked, and work to be performed. This itinerary shall be submitted to the Underwater Archaeological Research Section. Unforeseen circumstances requiring exceptions to the two (2) week itinerary requirements shall be reported to and acknowledged by the Division.

(5) All persons, firms or corporations having contracts with the Division shall be required to comply with all reasonable requests or directives addressed to them by the duly authorized agents or employees of the Division with respect to the operations authorized by said contracts.

(6) At all times there shall be one person in charge designated by, and acting for, the contractor aboard the vessel or group of vessels engaged in contract operations who shall be responsible for compliance with the rules and directives of the Division or its designated agents, to insure the preservation of archaeological and historical data.

(7) The contractor shall keep a ship's log, to be furnished by the Division, on all boats engaged in search or salvage operations. This log shall be properly kept, on a daily basis, in accordance with the instructions from the Division.

(8) All contractor's crew lists shall be submitted to the Division prior to starting work on the contract site, including name, birthdate, address, occupation, and social security number, of each crew member. In the event additional personnel are employed, the Division shall immediately be furnished the required information. All visitors or guests on board the contract vessel shall be recorded by the field agent on board, and recorded in the "Record (Log) of Daily Activities" by the person in charge, which record shall include: name, birthdate and address of each guest.

Specific Authority 267.031(4) FS. Law Implemented 267.031(5) FS. History—New 5–7–68, Amended 1–1–75, 9–6–78.

1A–31.11 Boats to carry identification.

(1) All boats are required to carry identification as required by the Division while operating under exploration or salvage contracts.

(2) In advance of initial search or salvage operations, the contractor shall furnish the Director and the Division's agent a list of all vessels to be used in the search or salvage operation, including a full description and the registration number of each vessel. No vessel shall engage in search or salvage operations if it has not been approved by the Division.

(3) Each vessel engaged in search or salvage operations shall be marked both by a flag to be furnished by the Division and the contract number. The flag shall be displayed on the vessel so that it is clearly visible in all directions. The identification numbers shall be in block style with a minimum height of two (2) feet and of sufficient width to be prescribed by the Division. The identification numbers shall be placed so as to be prominently visible from the air, as well as from the sea. Each vessel used in search and salvage operations shall display the flag and identification number continuously from the time of leaving part to the time of return.

(4) Written identification provided the salvor by the Division shall be carried at all times by the vessel engaged in the search or salvage operations.

(5) All boats working salvage or exploration contracts with state representatives on

board shall be required to show evidence of quarterly Coast Guard Auxiliary inspection.

Specific Authority 267.031(4) FS. Law Implemented 267.061(2)(a) FS. History—New 5–7–68, Amended 1–1–75, 9–6–78.

**1A–31.12 Penalty; Unauthorized exploration and salvage.**

(1) Whoever removes, alters, or in any way tampers with treasure trove, artifacts, or any of the articles protected by Chapter 267, Florida Statutes, located on state lands without benefit of an exploration or salvage contract or other permit from the Division of Archives, History and Records Management shall be punished as provided by law.

(2) Whoever buys, receives, aids in the concealment of, or has in his possession such treasure trove, artifacts or other protected objects removed from state lands without benefit of a contract or permit from the Division with the knowledge that same was removed without benefit of a contract shall be punished as provided by law.

(3) In all cases of arrest and conviction under either of the above sections, all boats, instruments, and other equipment used in connection with such violation are hereby declared to be nuisances and shall be seized and carried before the court having jurisdiction of such offense for proper disposition thereof.

Specific Authority 267.031(4) FS. Law Implemented 267.031(4), 278.061 FS. History—New 12–19–70, Amended 9–6–78.

RULES OF THE DEPARTMENT OF STATE
DIVISION OF ARCHIVES, HISTORY AND RECORDS MANAGEMENT
HISTORIC SITES AND PROPERTIES
CHAPTER 1A–32
RESEARCH PERMITS FOR ARCHAEOLOGICAL SITES OF SIGNIFICANCE

1A–32.01 Definitions

1A–32.02 Scope

1A–32.03 Criteria for evaluating research requests

1A–32.04 Notification requirements for accredited institutions

1A–32.05 Application requirements for non-accredited institutions

**1A–32.01 Definitions.**

(1) Accredited Institutions shall mean those state institutions which permanently possess professional archaeological staff who meet or, in the judgment of the State Archaeologist, are capable of meeting the criteria of training and experience necessary for registration in the Society of Professional Archaeologists with emphases in field and collections research as defined in the "Qualifications for Recognition as a Professional Archaeologist," of the Society. The emphases in field and collections research may be represented by separate individuals. Such institutions should also subscribe to the "Code of Ethics," "Standards of Research Performance," and "Institutional Standards" of the Society of Professional Archaeologists, particularly in respect to facilities and support services for the successful, professional conduct of archaeological field research.

(2) Non-Accredited Institution shall mean all other institutions as provided in Subsection 267.12(1), Florida Statutes.

(3) Professional archaeological expertise shall mean persons who meet, or in the judgment of the State Archaeologist are capable of meeting, the criteria of training and experience necessary for registration in the Society of Professional Archaeologists, as defined in the "Qualifications for Recognition as a Professional Archaeologist" of the Society.

(4) Professional quality research shall mean research conducted by persons with professional archaeological expertise and in a manner consistent with the "Code of Ethics" and "Standards of Research Performance" of the Society of Professional Archaeologists.

Specific Authority 267.031(4) FS. Law Implemented 267.12 FS. History—New 1–1–75, Amended 9–7–78.

**1A–32.02 Scope.** The scope of this chapter is to specify the criteria imposed by the Division upon institutions seeking research permits and filing written notification, and the Division's procedures for processing

such, as well as the necessary supportive material regarding proposed Archaeological Research upon state-owned lands, state-owned sovereignty submerged lands, Archaeological landmarks and Archaeological landmark zones.

Specific Authority 267.12(1) FS. Law Implemented 267.12 FS. History—New 1-1-75.

1A-32.03 Criteria for evaluating research requests. The following criteria are established to insure that research upon archaeological sites pursuant to Section 267.12, Florida Statutes, shall be conducted in a professional manner, and that the data recovered as a result thereof shall benefit the people of Florida in understanding their rich and varied heritage. All research requests shall contain the following:

(1) Only reputable museums, universities, colleges or other historical, scientific or educational institutions or societies will be considered as valid research applicants; and,

(2) Applicants shall possess or will secure the professional archaeological expertise necessary for the performance of professional quality archaeological field research, comprehensive analysis and interpretation in the form of publishable reports and monographs; and,

(3) Applicants shall possess or will secure sufficient artifactual conservation and storage capabilities to insure artifact preservation during the research period; and,

(4) No research request shall be considered, exclusive of reconnaissance survey requests, unless (a) a degree of endangerment to the archaeological resources is present in the proposed research are (i. e. severe erosion); (b) the proposed research area form an integral part in a well-defined research design or (c) the research is part of a planned interpretive reconstruction or restoration project; and,

(5) Adequate funding capability must be available to full implement the proposed research plan, including field work, laboratory analysis and processing and manuscript preparation.

Specific Authority 267.031(14) FS. Law Implemented 267.12 FS. History—New 1-1-75, Amended 9-7-78.

1A-32.04 Notification requirements for accredited institutions.

(1) A written notification to the Division by; accredited institutions requesting approval for archaeological research according to Subsection 267.12(2), Florida Statutes, must be submitted prior to scheduled project initiation.

The notification shall contain all of the following items:

(a) Name and address of the requesting institution;

(b) Date of notification;

(c) Specific location(s) of the proposed research area, including site names and numbers where applicable;

(d) Aims, character, and purpose of the proposed research; (Include a clear and concise research design.);

(e) Specific threats or endangerment of archaeological sites within the proposed project area (if applicable);

(f) Name of the individual in direct charge of the field research;

(g) Total number of project personnel;

(h) Initiation and termination dates of the research;

(i) Proposed publication source and date the completed manuscript;

(j) Total research funds to be expended on the project; and,

(k) Signature of the requesting official.

(2) The Division will respond to the requesting accredited institution within 15 days after receipt of the written notification. The Division's response will consist of (a) approval, or, (b) disapproval, or (c) a request for information clarification. In the event the Division requests clarification of one or more items in the written notification, the 15 day response obligation will take effect upon receipt of the additional information by the Division.

Specific Authority 267.031(4) FS. Law Implemented 267.12(2) FS. History—New 1-1-75, Amended 9-7-78.

1A-32.05 Application requirements for non-accredited institutions.

(1) Non-accredited institutions desiring to conduct research under Subsection 267.-12(1), Florida Statutes, must apply to the Division for a research permit for each and every proposed project. Permit application forms are available from the Division, and in addition to the requirements imposed upon accredited institutions by Paragraphs (a)–(k) of Subsection 1A–32.04(1) herein, non-accredited institutions must supply the following information:

(a) Name, address and official status of person to be in general charge of project, including a resume of previous experience pertinent to archaeological research; and,

(b) Nature, status and scientific affiliations of applicant organization; and,

(c) Names and qualification of additional research participants who will exercise any supervisory authority during the proposed research project; and,

(d) Total fiscal resources available for publication requirements.

(2) Completed permit applications must be submitted to the Division prior to the project research initiation date.

Specific Authority 267.031(4) FS. Law Implemented 267.12(1) FS. History—New 1–1–75, Amended 9–7–78.